UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

EDDIE M. VARGAS,

        Plaintiff,

v.

MIKE KNOWLES,

        Defendant.

Case No.  03-cv-02930-EJD

**ORDER DENYING PETITION FOR WRIT OF HABEAS CORPUS; DENYING CERTIFICATE OF APPEALABILITY**

Re: Dkt. No. 1

        Petitioner Eddie Vargas, represented by counsel, has filed a Petition for a Writ of Habeas Corpus under 28 U.S.C. § 2254 challenging a judgment of conviction from Santa Clara County Superior Court.  For the reasons set forth below, the Petition for a Writ of Habeas Corpus is **DENIED**.

**PROCEDURAL HISTORY**

        On July 14, 1997, a jury found Petitioner guilty of first degree murder and guilty of conspiracy to commit murder, assault with a deadly weapon, intimidation of witnesses, and possession of a concealable firearm by a convicted felon.  Pet. at 9.  The jury also found true the criminal street gang enhancement allegations and the prior felony convictions allegation.  Pet. at 9.  The state trial court sentenced Petitioner to a term of sixty years to life in state prison.  Pet. at 9.

        On August 6, 2001, the state appellate court affirmed the judgment.  Resp. Ex. 1.  On November 11, 2001, the California Supreme Court denied review.  Resp. Ex. 2.  On October 1,

United States District Court
Northern District of California

2002, Petitioner filed a pro per petition for a writ of habeas corpus in the California Supreme Court. On April 30, 2003, the petition was denied. Resp. Ex. 3.

Petitioner filed the instant pro per petition for a writ of habeas corpus on June 24, 2003. Dkt. No. 1. In July 2005, the Court granted Petitioner's motion to appoint counsel. Dkt. Nos. 140, 142. The Court stayed the case in November 2008 to allow Petitioner to exhaust new claims in state habeas proceedings, then reopened the case at Petitioner's request in November 2011. Dkt. Nos. 189, 207. In November 2012, this Court granted Petitioner's request for a new attorney. Dkt. Nos. 226, 229. On April 3, 2015, Petitioner moved to amend his habeas petition to add the now-exhausted claims. Dkt. No. 240. On August 10, 2016, this Court denied Petitioner's motion to amend, finding that Petitioner's new claims were futile because they were procedurally barred or untimely. Dkt. No. 248. Therefore, the only claims before this Court are the claims presented in Petitioner's June 24, 2003 habeas petition.

## DISCUSSION

A.    Factual Background

The following facts are summarized from the opinion of the California Court of Appeal. Resp. Ex. 1. Petitioner was a member of the Nuestra Familia, a prison gang founded in September 1968 by inmates at the California State Prison San Quentin. The Nuestra Familia is considered "the most organized prison gang" in the California Department of Corrections and has influence both inside and outside of prison walls. Nuestra Familia membership is a lifetime commitment. According to the Nuestra Familia constitution, leaving the gang is punishable by death. When members defect from the Nuestra Familia, they are usually labeled traitors and killed.

One objective of the Nuestra Familia is "to build the organization on the outside, become self-supporting, work with those in alliance, any and all illegal ventures to build the funds that can be utilized to take care of members behind the walls or drug deals on the streets." To accomplish that objective, the Nuestra Familia has often targeted and killed anyone who opposes the gang, including defectors and rival gang members. In the instant case, the prosecution charged a number

United States District Court
Northern District of California

of crimes that were committed by various members of the Nuestra Familia. Perpetrating such activities was in furtherance of the overriding purpose of the Nuestra Familia—namely, "to establish power through the use of crime, force, and fear, and to use that power to further strengthen and perpetuate itself by killing its enemies, raising money for the gang, and instilling obedience and discipline among its members."

Petitioner was charged with the murder of Elias Rosas and conspiracy to commit various crimes. Petitioner was allegedly involved in three incidents along with other Nuestra Familia affiliates such as Bobby Lopez, Jerry Salazar, Roland Saldivar, Louis Chavez, Albert Reveles, Tim Hernandez, and Ronnie Shelton. The Court provides the full summary from the California Court of Appeal's opinion:

### D–9. Attempted Murder of Urango

Lopez authorized the murder of Alphonso "Huero" Urango because Urango "disrespected" the [Nuestra Familia] by not returning two guns, which belonged to the [Nuestra Familia]. Urango had said that he would trade the guns for a gram of PCP. Salazar testified that Urango's offer was "an automatic green light." Salazar talked with [Petitioner] about Urango's murder. In late June, or early July 1991, [Nuestra Familia] members, including Salazar, [Carlos] Mendoza, and [Petitioner] went to Urango's apartment to kill him. When they arrived, [Petitioner] told Saldivar and Mendoza to go to the apartment door, knock on it, and shoot Urango when he opened the door. When Saldivar and Mendoza knocked on the door, Urango's girlfriend, who was eight months pregnant, answered the door. Saldivar and Mendoza did not have the "guts" to kill Urango under the circumstances. No further attempts on Urango's life were made.

### D–10. Murder of Rosas

[Elias] Rosas was a member of the [Northern Structure, a gang subservient to the Nuestra Familia].

On December 31, 1983, two masked men broke into the home of Petra Gonzalez, who was the mother of Rosas' girlfriend. Rosas went to Gonzalez's defense.

After the Gonzalez robbery, and while [Pablo] Pena was in prison with Chavez, Pena told Chavez that he (Pena) had robbed Rosas' home, taking drugs. Pena further told Chavez that he (Pena) believed that Rosas had "snitched on him." Chavez stated that even though Rosas was the victim, Rosas should not have told

the police because Pena was a member of the [Nuestra Familia] at the time of the robbery, and Rosas was not.

In late June 1991, . . . [Petitioner] discussed the Rosas matter with Salazar. [Petitioner] told Salazar that there was a "green light" on Rosas because Rosas had "snitched on Pablo Pena, Panther." However, [Petitioner] wanted to get some confirming "paperwork" first because if [Petitioner] was wrong and Rosas was killed, [Petitioner] would be killed. [Petitioner] told Salazar that the [Nuestra Familia] was not to hunt down Rosas to kill him, but that if [a Nuestra Familia] member should run across him, Rosas should be killed.

On the night of Rosas' murder, Chavez received a telephone call from Albert Reveles and Tim Hernandez. Hernandez told Chavez that he was at a home where Rosas was "running his mouth" about Chavez, saying that Chavez was to be "hit" by the [Nuestra Familia]. Hernandez asked Chavez what should be done to Rosas, saying he wanted to kill Rosas. Chavez told Hernandez he did not have the authority to authorize the murder of Rosas because [Petitioner] was in charge.

Chavez contacted Salazar, who set up a three-way telephone conference with [Petitioner]. In that telephone conference, [Petitioner] approved the murder of Rosas, saying: "Do what you got to do." [Petitioner] also told Chavez that he (Chavez) had the authority to call the hit.

Hours later, Hernandez called Chavez to report that Rosas had been killed.

Subsequently, [Petitioner] told Shelton at San Quentin that Rosas was behind "some drug deal that some drugs were involved and [Rosas] supposedly had snitched on [Pena] who's also an [Nuestra Familia] member." [Petitioner] admitted to Shelton that he [Petitioner] had called the Rosas "hit."

*D–11. Order to Kill Esparza*

[James] Esparza was on the [Nuestra Familia] "hit" list that Chavez and Pena had compiled in 1990. Salazar testified that [Petitioner] had ordered him to kill Esparza. [Petitioner] told Salazar that Esparza was in trouble because Esparza was claiming that he was a member of the [Northern Structure], and he was not. Salazar did not carry out [Petitioner's] order because he believed that [Petitioner] had a "personal thing" on Esparza concerning [Petitioner's] girlfriend.

Resp. Ex. 1 at 10–12 (some alterations in original).

B.   Standard of Review

     This Court may entertain a petition for a writ of habeas corpus "in behalf of a person in

custody pursuant to the judgment of a State court only on the ground that he is in custody in

violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a). The writ may not be granted with respect to any claim that was adjudicated on the merits in state court unless the state court's adjudication of the claim: "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." Id. § 2254(d).

"Under the 'contrary to' clause, a federal habeas court may grant the writ if the state court arrives at a conclusion opposite to that reached by [the U.S. Supreme] Court on a question of law or if the state court decides a case differently than [the U.S. Supreme] Court has on a set of materially indistinguishable facts." Williams v. Taylor, 529 U.S. 362, 412–13 (2000). The only definitive source of clearly established federal law under 28 U.S.C. § 2254(d) is the holdings (as opposed to the dicta) of the U.S. Supreme Court as of the time of the state court decision. Williams, 529 U.S. at 412; Brewer v. Hall, 378 F.3d 952, 955 (9th Cir. 2004). While circuit law may be consulted to determine whether the circuit "has already held that the particular point in issue is clearly established by U.S. Supreme Court precedent," circuit precedent cannot "refine or sharpen a general principle of Supreme Court jurisprudence into a specific legal rule that [the U.S. Supreme] Court has not announced." Marshall v. Rodgers, 569 U.S. 58, 64 (2013) (per curiam).

"Under the 'unreasonable application' clause, a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from [the U.S. Supreme] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case." Williams, 529 U.S. at 413. "Under § 2254(d)(1)'s 'unreasonable application' clause, . . . a federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly." Id. at 411. Instead, a federal habeas court making the "unreasonable application" inquiry should ask whether the state court's application of clearly established federal law was

"objectively unreasonable." Id. at 409. The federal habeas court must presume correct any determination of a factual issue made by a state court unless the petitioner rebuts the presumption of correctness by clear and convincing evidence. 28 U.S.C. § 2254(e)(1).

The state court decision to which § 2254(d) applies is the "last reasoned decision" of the state court. See Ylst v. Nunnemaker, 501 U.S. 797, 803–04 (1991). When there is no reasoned opinion from the highest state court considering a petitioner's claims, the court "looks through" to the last reasoned opinion. See id. at 805.[1] When no state court opinion explains the reasons relief has been denied, "the habeas petitioner's burden still must be met by showing there was no reasonable basis for the state court to deny relief." Harrington v. Richter, 562 U.S. 86, 98 (2011).

The U.S. Supreme Court has vigorously and repeatedly affirmed that under § 2254, there is a heightened level of deference a federal habeas court must give to state court decisions. See Dunn v. Madison, 138 S. Ct. 9, 12 (2017) (per curiam); Kernan v. Cuero, 138 S. Ct. 4, 9 (2017) (per curiam); Virginia v. LeBlanc, 137 S. Ct. 1726, 1728 (2017); White v. Wheeler, 136 S. Ct. 456, 461 (2015); Woods v. Donald, 135 S. Ct. 1372, 1376 (2015) (per curiam). As the U.S. Supreme Court has explained, on federal habeas review, § 2254 "imposes a highly deferential standard for evaluating state-court rulings and demands that state-court decisions be given the benefit of the doubt." Hardy v. Cross, 565 U.S. 65, 66 (2011) (per curiam) (quoting Felkner v. Jackson, 562 U.S. 594, 598 (2011) (per curiam) (internal quotation marks omitted)). With these principles in mind regarding the standard and limited scope of review in federal habeas proceedings, the Court addresses Petitioner's claims.

---

[1] The outcome in this case will not be affected by the U.S. Supreme Court's grant of certiorari and forthcoming decision in Wilson v. Sellers, 137 S. Ct. 1203 (2017). In this case, for the eleven claims considered by the California Court of Appeal, neither party disputes that this Court should review the opinion of the Court of Appeal. Moreover, this Court need not consider hypothetical reasons supporting the Court of Appeal's decision on those claims because, as discussed below, the Court of Appeal's stated reasons provide a sufficient basis to deny Petitioner's habeas petition.

Case No.: 03-cv-02930-EJD
ORDER DENYING PETITION FOR WRIT OF HABEAS CORPUS; DENYING CERTIFICATE OF APPEALABILITY

1    C.    <u>Claims and Analysis</u>

2         Petitioner raises the following fourteen grounds for federal habeas relief:

3         (1) Petitioner contends that he received ineffective assistance of counsel during

4    proceedings on the prosecution's motion to vacate his plea agreement and that his resulting

5    sentence constitutes cruel and unusual punishment;

6         (2) Petitioner contends that the trial court's restrictions on testimony about the killing of

7    Paul Farfan violated due process and Petitioner's right to confront witnesses;

8         (3) Petitioner contends that the trial court's restriction of the cross-examination of John

9    Kracht violated due process and Petitioner's right to confront witnesses;

10        (4) Petitioner contends that the trial court's failure to instruct on second degree murder

11   violated due process, his right to present a defense, and his right to trial by jury;

12        (5) Petitioner contends that the trial court's failure to instruct the jury to decide whether

13   one or multiple conspiracies existed violated due process and his right to trial by jury;

14        (6) Petitioner contends that the trial court's failure to instruct the jury to unanimously agree

15   on the facts underlying the conspiracy violated due process and his right to trial by jury;

16        (7) Petitioner contends that he received inadequate notice of the conspiracy charge in

17   violation of the Sixth Amendment and due process;

18        (8) Petitioner contends that his conspiracy conviction is unconstitutionally vague;

19        (9) Petitioner contends that there was insufficient evidence to support his conviction for

20   conspiracy to commit murder;

21        (10) Petitioner contends that the trial court's failure to modify the withdrawal instruction

22   violated due process, his right to present a defense, and his right to trial by jury;

23        (11) Petitioner contends that his consecutive 25-years-to-life sentences for murder and

24   conspiracy to commit murder violated his right to trial by jury and due process;

25        (12) Petitioner contends that his visible shackling throughout the trial violated his right to

26   an impartial jury and due process;

27
Case No.: 03-cv-02930-EJD
28   ORDER DENYING PETITION FOR WRIT OF HABEAS CORPUS; DENYING CERTIFICATE
     OF APPEALABILITY

1  (13) Petitioner contends that he received ineffective assistance of counsel at multiple points

2  during the litigation; and

3  (14) Petitioner contends that he was denied his Sixth Amendment right to present a defense

4  of his choosing.

5  Each claim is analyzed in turn below.

6          1.  <u>Proceedings on motion to vacate Petitioner's plea agreement</u>

7  Petitioner's first claim relates to the proceedings on the prosecution's motion to vacate

8  Petitioner's plea agreement.  In March 1993, Petitioner entered into a plea agreement to cooperate

9  with the prosecution.  Pet. at 8.  The relevant proceedings began in July 1994, when the

10  prosecution moved to vacate Petitioner's plea agreement on the ground that Petitioner had violated

11  the agreement by providing false material information.  Resp. Ex. 1 at 19.  In granting the

12  prosecution's motion, the trial court relied in part on the results of a polygraph examination of

13  Petitioner, which all of the attorneys—including Petitioner's attorney—had agreed to admit.

14  Resp. Ex. 1 at 19–20.  Although Petitioner challenged the propriety of vacating his plea agreement

15  before the California Court of Appeal, he does not renew that challenge here.  Instead, he

16  maintains that his attorney provided ineffective assistance of counsel under the Sixth Amendment

17  by failing to conduct an adequate investigation into whether Petitioner would pass a polygraph

18  examination before agreeing to admission.  Pet. at 9–10.  Petitioner also claims that his resulting

19  sentence of 60 years to life constitutes cruel and unusual punishment under the Eighth

20  Amendment.  Pet. at 10–11.  The Court addresses these claims in turn.

21          a.  <u>Sixth Amendment right to effective assistance of counsel</u>

22  The California Court of Appeal rejected Petitioner's ineffective assistance claim,

23  explaining:

24  [Petitioner] contends trial counsel deprived him of his Sixth Amendment right to

25  effective assistance of counsel during the proceedings on the motion to vacate his

26  plea agreement by failing to fully investigate the likelihood of his passing a

27

27

28  Case No.: 03-cv-02930-EJD
ORDER DENYING PETITION FOR WRIT OF HABEAS CORPUS; DENYING CERTIFICATE
OF APPEALABILITY

United States District Court
Northern District of California

8

polygraph examination prior to stipulating to the admission of the results of a polygraph examination. We disagree.

It has repeatedly been held that "'[a] convicted defendant's claim that counsel's assistance was so defective as to require reversal of a conviction or death sentence has two components.' 'First, the defendant must show that counsel's performance was deficient.' Specifically, he must establish that 'counsel's representation fell below an objective standard of reasonableness . . . under prevailing professional norms.'" "In addition to showing that counsel's performance was deficient, a criminal defendant must also establish prejudice before he can obtain relief on an ineffective-assistance claim." "Errorless counsel is not required . . . ."

Moreover, "a court need not determine whether counsel's performance was deficient before examining the prejudice suffered by the defendant as a result of the alleged deficiencies. The object of an ineffectiveness claim is not to grade counsel's performance. If it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice, which we expect will often be so, that course should be followed. Courts should strive to ensure that ineffectiveness claims not become so burdensome to defense counsel that the entire criminal justice system suffers as a result." (*Strickland v. Washington* (1984) 466 U.S. 668, 697.)

Here, after the prosecution had filed its motion to set aside the plea agreement, [Petitioner]'s counsel and the prosecutor stipulated that [Petitioner] would submit himself to a polygraph examination by an expert acceptable to both parties, and that the results of the test would be submitted to the court to aid it in its determination of whether [Petitioner] had committed a material breach of the plea agreement. The defense and the prosecution then mutually agreed on FBI special agent Ron Hilley to conduct the polygraph test on [Petitioner]. Hilley concluded that [Petitioner] was deceptive in his answers to the four relevant questions that were related to a particular inconsistency in [Petitioner's] statements.

In its order setting aside [Petitioner's] plea agreement, the court stated that it relied in part on Hilley's testimony.

In arguing ineffective assistance, [Petitioner] asserts that "reasonably competent counsel would not stipulate to the admission of polygraph results without first conducting some investigation to ensure that the stipulated evidence would be favorable to [Petitioner]." [Petitioner] points to no place in the record, however, which would indicate that trial counsel had agreed to the stipulation relating to [Petitioner's] polygraph examination without first reasonably informing himself of the probable outcome of such an examination. [Petitioner] bears the burden of showing to this court that trial counsel's agreement to the polygraph examination stipulation was not an informed decision. . . . "When a defendant on appeal makes a claim that his counsel was ineffective, the appellate court must consider

whether the record contains any explanation for the challenged aspects of the representation provided by counsel. 'If the record sheds no light on why counsel acted or failed to act in the manner challenged, "unless counsel was asked for an explanation and failed to provide one, or unless there simply could be no satisfactory explanation," the contention must be rejected.'"

On this record, [Petitioner] has not carried his burden of showing that trial counsel's decision was not informed. Presuming an informed decision by trial counsel, we must further presume that trial counsel's decision was a tactical choice which we cannot, for such lack of showing, review in this appeal.

Resp. Ex. 1 at 23–25 (some alterations in original) (some citations omitted).

A claim for ineffective assistance of counsel is subject to the two-prong test set forth in Strickland v. Washington, 466 U.S. 668, 687 (1984). First, Petitioner must demonstrate that counsel's performance was deficient, *i.e.*, that it "so undermined the proper functioning of the adversarial process that the [proceedings] cannot be relied on as having produced a just result." Id. at 686–87. In making that assessment, "a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action 'might be considered sound trial strategy.'" Id. at 689 (citation omitted). Second, Petitioner must demonstrate that counsel's deficient performance prejudiced him, *i.e.*, that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." Id. at 694. The U.S. Supreme Court has described Strickland as imposing a "highly demanding" standard which requires the Petitioner to show "gross incompetence" of his attorney. Kimmelman v. Morrison, 477 U.S. 365, 382 (1986).

Here, the California Court of Appeal did not unreasonably apply Strickland in concluding that Petitioner failed to show that his lawyer's performance was deficient. Petitioner makes the bare assertion that "reasonably competent counsel would not stipulate to the admission of polygraph results without first conducting some investigation to ensure that the stipulated evidence would be *favorable* to [Petitioner]." Pet. at 11. In particular, Petitioner pinpoints his counsel's failure to "conduct[] a preliminary polygraph examination" of Petitioner. Pet. at 10.

1    But Petitioner does not identify any U.S. Supreme Court authority requiring counsel to perform

2    this specific type of investigation.

3         And Petitioner's counsel supplies a legitimate basis for his decision.  He believed that

4    conducting a preliminary polygraph examination was a bad strategic move.  In particular,

5    Petitioner's counsel thought that he would not be able to conduct a secret preliminary polygraph

6    examination of Petitioner in jail.  Resp. Ex. 23.  Therefore, if Petitioner's counsel conducted the

7    preliminary polygraph and Petitioner failed, a subsequent refusal to submit to the prosecution's

8    requested polygraph could be seen as failure to cooperate and violate Petitioner's plea agreement.

9    Resp. Ex. 23; Resp. Ex. 8, CT 1301–04.  Moreover, Petitioner's counsel had reason to believe that

10   Petitioner would pass the polygraph.  In an earlier meeting with the prosecution, Petitioner had

11   agreed to take a polygraph examination.  Resp. Ex. 23.  When the judge suggested using a

12   polygraph examination for the hearing on the motion to vacate Petitioner's plea agreement,

13   Petitioner said that he would pass the test.  Resp. Ex. 23; Resp. Ex. 6, RT 17740 ("[Petitioner] said

14   he knew all about polygraphs, he had taken them before and that he could handle it, he could pass

15   it.").  Thus, taking into account "counsel's conversations with the [Petitioner]," Strickland, 466

16   U.S. at 691, Petitioner's counsel stated that he believed Petitioner could pass the examination if he

17   told the truth.  Resp. Ex. 23.  And Petitioner's counsel conducted the important investigative steps

18   of confirming the qualifications of the polygraph operator to ensure that the results would be

19   accurate.  Resp. Ex. 23.  In these circumstances, the Court of Appeal did not unreasonably

20   determine that Petitioner's counsel made an informed tactical decision, especially when Petitioner

21   presented minimal evidence to overcome the "strong presumption that counsel's conduct falls

22   within the wide range of reasonable professional assistance."  Strickland, 466 U.S. at 689.

23   Petitioner is not entitled to habeas relief on this claim.

24              b.    Eighth Amendment prohibition on cruel and unusual punishment

25        The California Court of Appeal also rejected Petitioner's Eighth Amendment claim,

26   explaining:

27
     Case No.: 03-cv-02930-EJD
28   ORDER DENYING PETITION FOR WRIT OF HABEAS CORPUS; DENYING CERTIFICATE
     OF APPEALABILITY
                                                    11

United States District Court
Northern District of California

1
2
3

> [Petitioner] contends his sentence of 60 years to life violates the federal
> constitutional protection against cruel and unusual punishment given the improper
> vacating of his plea agreement under which he would have served only five years.
> The contention is without merit.

4
5
6
7

> [Petitioner] concedes that "a sentence of 60 years to life for murder and
> conspiracy is not per se cruel and unusual." [Petitioner] argues merely that
> because the vacation of his plea agreement was invalid, he should have been
> entitled to receive the benefit of his bargain, which was a sentence of five years,
> and, therefore, the 60-years-to-life sentence imposed on him was cruel and
> unusual.

8
9

> Because we have determined that the trial court committed no error in setting
> aside [Petitioner's] plea bargain, [Petitioner's] cruel and unusual challenge also
> fails.

10

Resp. Ex. 1 at 23.

11
12
13
14
15
16
17
18
19
20

It is established that, under the Eighth Amendment's prohibition against cruel and unusual punishment, a sentence that is grossly disproportionate to the crime is unconstitutional. See Solem v. Helm, 463 U.S. 277, 288 (1983); see also Lockyer v. Andrade, 538 U.S. 63, 72 (2003) ("Through this thicket of Eighth Amendment jurisprudence, one governing legal principle emerges as 'clearly established' under § 2254(d)(1): A gross disproportionality principle is applicable to sentences for terms of years."). The U.S. Supreme Court cases, however, are unclear about what factors inform or signify gross disproportionality. See, e.g., Harmelin v. Michigan, 501 U.S. 957, 965 (1991) (opinion of Scalia, J.); id. at 998 (Kennedy, J., concurring in part and concurring in the judgment); Solem, 463 U.S. at 294; see also Lockyer, 538 U.S. at 72 ("Our cases exhibit a lack of clarity regarding what factors may indicate gross disproportionality.").

21
22
23
24
25
26

The California Court of Appeal did not unreasonably apply federal law in concluding that Petitioner's sentence does not violate the Eighth Amendment. Petitioner conceded before the Court of Appeal (and concedes here) that "[a] sentence of 60 years to life for murder and conspiracy is not per se cruel and unusual." Pet. at 12. Given that proportionality is measured against the crime committed, Solem, 463 U.S. at 288, that concession would appear to end the

27
28

Case No.: 03-cv-02930-EJD
ORDER DENYING PETITION FOR WRIT OF HABEAS CORPUS; DENYING CERTIFICATE
OF APPEALABILITY

matter. Petitioner nevertheless argues that his sentence is grossly disproportionate to the sentence that he would have received under the plea agreement and the sentence that other defendants in this case received under their plea agreements. Pet. at 12–13. No cited Supreme Court precedent authorizes such comparisons for determining gross disproportionality under the Eighth Amendment. As the California Court of Appeal observed, evaluating Petitioner's ultimate sentence against the sentence he would have received under his plea agreement is particularly unwarranted because the plea agreement was properly vacated. Resp. Ex. 1 at 23. Moreover, Petitioner's actual sentence of 60 years to life for murder and conspiracy does not appear grossly out of line with some of the comparator defendants, such as Shelton whose plea called for a sentence of 100 years to life for four murders and Salazar whose plea called for a minimum sentence of 50 years to life. Resp. Ex. 6, RT 10006, 13023. Petitioner has not demonstrated entitlement to habeas relief on his Eighth Amendment claim.

       2.    <u>Examination of witnesses about the killing of Paul Farfan</u>

      Petitioner's second claim is that the trial court improperly precluded Petitioner from conducting direct and cross-examinations about the killing of Paul Farfan. Pet. at 13. Petitioner contends that cooperating witness Salazar would have testified that non-witness Vincent Arroyo ordered Farfan's murder, whereas Arroyo would have denied that he authorized the murder. Pet. at 13. In Petitioner's view, that inconsistency would have undermined Salazar's credibility and would have shown that the prosecution knowingly presented false testimony. Pet. at 13–15. Petitioner argues that prohibiting this testimony was a violation of Petitioner's Sixth Amendment right to confront witnesses and his Fourteenth Amendment right to due process. Pet. at 14.

      The California Court of Appeal rejected Petitioner's claim, explaining:

[Petitioner] contends the trial court violated his Sixth and Fourteenth Amendment rights by precluding him from cross-examining two prosecution witnesses and conducting direct examination of one potential defense witness regarding the killing of Farfan, which would have elicited evidence that the prosecution pursued a flawed policy of presenting unreliable accomplice witnesses against [Petitioner]

and that a critical witness against [Petitioner] was unworthy of belief. The contention is without merit.

Salazar, Arroyo, and Mendoza, who were indicted with [Petitioner] and other codefendants, entered guilty pleas. The prosecution thereafter called Salazar and Mendoza to the witness stand, but did not call Arroyo.

[Petitioner] joined a defense motion to allow the defense to cross-examine Salazar regarding the Farfan murder. In particular, the defense wanted to show to the jury that Salazar had made the statement that Arroyo had authorized Farfan's murder, and that Arroyo had denied authorizing Farfan's murder. The attorney representing codefendant [James] Trujeque told the court at a bench conference that "[o]ne of the two of them is lying. And, therefore, there is a problem with the deals that they've cut with the prosecution." The prosecution objected that the proffered evidence constituted impeachment on a collateral matter. The court told the defense that if it decided to bring up the Farfan murder, which happened after the indictment in this case, it did so at its own risk if the evidence turned out to be inadmissible because it would require an admissibility hearing.

On February 7, 1997, prior to Salazar's testimony, the court took up the Farfan issue again. The prosecution argued that evidence relating to the Farfan murder would be admissible only if Arroyo testified, since evidence of Salazar's participation in that murder would then be admissible as a prior bad act for impeachment; moreover, if Salazar's testimony was the result of a plea bargain in which the murder of the Farfan case was dismissed, "then that could be presented also as an issue, although I would say parenthetically that his testimony [was] not predicated on the dismissal of the Farfan case."

The defense agreed with the prosecution that evidence of the Farfan homicide was admissible only if Arroyo testified. However, counsel for codefendant Trujeque expressed his intention to attack Salazar's credibility with the Farfan homicide because Salazar's and Arroyo's statements respecting that homicide contradicted each other. The court asked Trujeque's attorney if he intended to call Arroyo as a witness if the prosecution did not call Arroyo. Trujeque's attorney responded he would do so if Salazar testified that Arroyo had authorized Farfan's murder. The prosecution stated that it had been informed by Arroyo's attorney that if the defense attempted to call Arroyo as a witness, Arroyo would assert his right against self-incrimination, adding that if Arroyo testified the prosecution would not grant Arroyo immunity. The court stated it was disposed to allow the defense to ask Salazar questions relating to the Farfan murder.

On March 17, 1997, just prior to the commencement of Salazar's cross-examination, the defense brought up again the issue of whether it could ask Salazar questions on the Farfan homicide and asked the court for a hearing on the issue. The prosecution restated its intention not to call Arroyo as a witness, and

Case No.: 03-cv-02930-EJD
ORDER DENYING PETITION FOR WRIT OF HABEAS CORPUS; DENYING CERTIFICATE OF APPEALABILITY

14

further told the court that Arroyo's attorney had informed her that Arroyo "will take the Fifth and will not testify if called as a witness by the defense."

The court did not rule on the issue, stating instead that it "would like to see how the situation develops," and inquiring of the defense what it intended to ask Salazar. Trujeque's attorney responded that he would ask Salazar if he (Salazar) had ordered Farfan's murder. If Salazar answered he did not, he (Trujeque's attorney) would then ask Salazar if Arroyo did. The court stated: "Well, let me indicate this, Mr. Salazar has made it clear in no uncertain terms he's testifying truthfully and turned his life around. If you want to impeach his claim of truthfulness by asking him whether he was involved in the Farfan murder, you can. If you, and, I take it, if you do, that's a prerequisite to impeaching him, assuming that he says he was not. [¶] As far as going any further with this witness as to who ordered it and that sort of thing, that's premature. That sounds like you're attempting to set up impeachment of Arroyo. He has not testified yet. We don't know if he's going to testify. Should he testify, we can revisit the issue."

On March 18, 1997, during Salazar's cross-examination, the defense explained its theory of admissibility, which was that the Farfan homicide was an impeachable offense as to Salazar, and would further show that Salazar had a reason not to be truthful about his role in that homicide because his plea agreement was conditioned upon his non-involvement in it. The court replied that if it let in any mention of the Farfan homicide, it would let in all facts surrounding that homicide.

[Petitioner] joined the motion to allow Salazar to be examined about the Farfan homicide.

The court denied the defense request, stating: "[M]y ruling at this point subject to counsel persuading me differently is that that subject is not to be covered in cross-examination. I will sustain the [Evidence Code section] 352 objection. In so doing I'm considering the amount of time that we would have to devote to the Farfan matter. But more than that, I'm also considering everything I've heard in cross-examination so far, and I used the term ammunition, it's not a legal term. There's been a wealth of evidence that has been used so far to attack the credibility of this witness, and what has occurred so far during cross-examination. And it seems to me the Farfan matter isn't something crucial. So I find the relevancy to be substantially outweighed by undue consumption of time and confusing the issues."

On March 19, 1997, the court allowed the parties to discuss the Farfan homicide issue further. The defense made an offer of proof that included the following: (1) Salazar's ex-wife became romantically involved with Farfan in the late summer of 1992, and the two lived openly together in January 1993; (2) Salazar knew that

his ex-wife was living with Farfan; (3) Salazar stated in his June 23 statement to the police that while he was in a holding cell in early 1993, he heard Arroyo say that a "green light" should be placed on Farfan because Farfan had cheated the [Nuestra Familia] out of its money; (4) in September 1993, Farfan told parole agent E.J. Allen that his (Farfan's) life was in danger because he was dating Jessica Salazar and another woman; (5) Farfan was murdered on September 27, 1993; (6) Salazar met Louis Oliverez in 1989; (7) on October 7, 1993, Nancy Hermocillo told the police that on September 23, 1993, which was four days prior to Farfan's murder, she was at a friend's house and overheard a telephone conversation between Salazar and Oliverez wherein Salazar had asked Oliverez to kill Farfan; and (8) Salazar's plea agreement was conditioned upon Salazar's noninvolvement in the Farfan murder.

On March 26, 1997, the court once more denied the defense motion, reasoning that the prosecution did not intend to call Arroyo as a witness. The court admitted that the proffered evidence was relevant, but found it inadmissible under Evidence Code section 352 because admission of the evidence would confuse the jury and consume an undue amount of time. The court explained: "The issue of the admissibility of testimony concerning Paul Farfan, as I recall, arose in the context of a discussion at the bench where it was anticipated that Mr. Salazar and Mr. Arroyo would both testify. And the offer of proof was that their testimony would conflict as it relates to the subject of the green light on Paul Farfan, thus establishing that someone's not telling the truth, whether it's Mr. Salazar or whether it is Mr. Arroyo. And at that time, as I recall, I indicated preliminarily that I would allow some questioning in that area. [¶] Now, since that discussion, my understanding at this point is that Mr. Arroyo is not going to be testifying as a witness. That may change. If he does testify as a witness, this issue undoubtedly will be revisited, because I invite Mr. Mayfield [counsel for Trujeque] to revisit the issue. But the issue is not squarely before the court now. [¶] . . . [¶] The issue as I indicated is a [Evidence Code section] 352 issue. It is not a relevancy issue because obviously this testimony satisfies in my opinion the defense of relevant evidence in California. But being a [Evidence Code section] 352 issue, the court has to look at the probative value and weigh it against the possibility of confusing the issues, principally confusing the jury as well as the undue consumption of time. [¶] Now, the justification for offering this testimony in a very general sense is two-fold. One, it's the credibility of Jerry Salazar. And then, No. 2, something that I have quite—I have not completely understood, that is, Mr. Selvin [counsel for codefendant Herminio Serna], the argument about the theory—the theory of the conspiracy, its admissibility under the theory of the conspiracy. [¶] . . . [¶] Credibility is a very broad term. Whether they're talking about credibility in a general sense that Jerry Salazar is a liar or in a more specific sense that he's a liar in this particular case, has lied, and even more particularly has violated the plea agreement by not telling the truth. We're still talking about credibility. [¶] . . . [¶] [S]o far as it relates to Mr. Salazar, he has been impeached about prior inconsistent statements in a number of instances by

defense counsel. Additionally, he's admitted lying in the past, and not just as it relates to the June '93 interview, but he has been compelled or persuaded to admit that he lied in other instances on the witness stand. [¶] Defense counsel certainly can argue the significance of his inconsistent statements, certainly can be argued that he has lied and is in fact an admitted liar. [¶] But not only that, as it relates to the use of the Farfan murder as an example of an act of moral turpitude which bears on his credibility, Mr. Salazar has been confronted with a number of instances that counsel can use to argue the point of credibility. [¶] There's the bowling alley set up that Mr. Salazar was involved [in] whereby an individual from Fresno was robbed and pistol whipped. [¶] There's the incident at J.P.'s involving two Chinese males that Mr. Salazar was involved with whereby he . . . sucker punched one of the individuals after apologizing to him, suggesting that he is a man of bad character not simply because he's violent, but there's also the suggestion he's homophobic. [¶] There's an incident described in the testimony at a disco where Mr. Salazar was there with Mr. Lopez and Mr. Shelton. [¶] There's the incident involving Roland Saldivar's uncle where Salazar admitted on the stand that he pointed a gun at the individual. [¶] There's the issue involving Mr. Urango where Mr. Salazar admitted to looking for him to kill him. [¶] There's the incident at King and Story Road where Mr. Salazar was the driver and a passenger shot, apparently wounding several Surenos. [¶] There's the incident involving . . . Alex Flemate, where Mr. Salazar was involved in a plot to kill him. [¶] There's the issue involving Spookio. And one of the interpretations of the evidence that I would assume the defense would find favorable was their suggestion that Mr. Salazar was involved in a plot to kill Spookio motivated by jealousy. [¶] There's the Beto Jasso incident, attempted killing of Carlos Mejias, that Mr. Salazar was involved in. [¶] We heard about a New Years incident I believe in Watsonville where Mr. Salazar had a stabbing instrument and apparently stabbed the wrong person by accident. [¶] We've heard that he planned the murder of one of the defendants in this case, [Petitioner]. [¶] There's even been a suggestion that when he was thrown in the hole when he was in prison just before his release that he was involved in some inappropriate activity. [¶] And then I also made note of his involvement in a robbery of a drug dealer in the City of Fresno. And there are others. [¶] The point I'm making is there's ample evidence to attack the credibility of Mr. Salazar based not only on his inconsistent statements of his admissions of being untruthful, but based on a number of specific instances. This is significant because in my opinion it lessens the probative value of the Paul Farfan incident. [¶] So what I find is the probative value, although there is some probative value, is not particularly extensive for all the reasons that I listed, and in particular the specific instances which counsel has inquired into already. [¶] What I do find is to allow the inquiry into the Paul Farfan incident as described in the offer of proof will cause undue consumption of time and can lead to the confusing of the jury in this case because one possible situation is a mini-trial where the death of Paul Farfan will be litigated. Certainly the People are allowed to litigate that issue if I allow the defense to do so. [¶] In short, I find that the probative value is outweighed by the

... 
factors I cited.  The court's ruling is the testimony is not admissible.  [¶]  I want to remind in particular Mr. Mayfield, if we have a situation arise similar to what we envisioned in the past, we, being all of us, involving Mr. Arroyo testifying, then the court is happy to revisit the issue."

On April 16, 1997, the defense again sought to bring out the issue of Salazar's perjury on the basis of the conflict between Salazar, who said that Arroyo had authorized Farfan's murder, and Arroyo, who denied authorizing such murder. The defense wanted to question Mendoza, who Salazar said was present when Arroyo gave the green light to murder Farfan.  Trujeque's counsel argued that he should be allowed to question Mendoza whether Arroyo had given the "green light," and be allowed to call Arroyo to ask whether he authorized the murder.

The prosecution responded that if the court allowed evidence of the Farfan homicide to come in, it was going to prove that what Salazar had said was true.

The court reiterated its ruling that evidence of the Farfan homicide was inadmissible, adding: "It was mentioned this afternoon that as it relates to the issue of credibility, Mr. Mayfield indicated he wanted to establish that Salazar will lie about murders.  Well, that's already been established in the testimony that he made some false accusations as it relates to who participated in what, and I know you're all familiar with that testimony.  [¶]  The right to confront and cross-examine is not without limitation as we all know.  And I feel that as it relates to Mr. Salazar, he has been confronted and cross-examined, not only at length, but with reference to a number of subjects where counsel would be able to argue forcefully that the man is a liar when this case is argued."

On August 15, 1997, the court denied [Petitioner's] motion for a new trial which [Petitioner] based, inter alia, on the ground of error in precluding evidence relating to the Farfan incident.

The standard of review for Evidence Code section 352 challenges is abuse of discretion.  "The court in its discretion may exclude evidence if its probative value is substantially outweighed by the probability that its admission will (a) necessitate undue consumption of time or (b) create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury."

On appeal, "'[a] trial court's exercise of discretion will not be disturbed unless it appears that the resulting injury is sufficiently grave to manifest a miscarriage of justice.  In other words, discretion is abused only if the court exceeds the bounds of reason, all of the circumstances being considered.'"

The underlying assumption in [Petitioner's] challenge is that the proffered evidence relating to the Farfan incident would have shown that either Salazar or Arroyo was lying.  The assumption is flawed.  The prosecution repeatedly told the

parties and the court that it was not going to call Arroyo as a witness, and, in fact did not call Arroyo. Because Arroyo did not testify, his version of the story was not before the jury. Consequently, the jury did not know that Arroyo's version was in conflict with Salazar's version. It follows that while Arroyo's version was relevant as tending to discredit Salazar, the court could reasonably conclude it was not probative enough to outweigh its potential for prejudice in terms of time consumption and issue confusion. The prosecution had indicated that if Arroyo testified, it would adduce evidence to prove that Salazar was telling the truth. The court, for its part, stated that if it allowed the defense to bring out evidence relating to the Farfan incident, it would also have to allow the prosecution to litigate the issue. The result would be a minitrial on a crime with which [Petitioner] was not charged, resulting in jury confusion and inordinate consumption of time.

[Petitioner] argues that the trial court's concern that allowing Salazar to be questioned on the Farfan incident would result in undue consumption of time was not well-founded because the trial was in fact finished several months earlier than estimated. The argument is not persuasive. "Undue consumption of time" refers not only to the time used to try the case, but also the time lost to the court by giving one case more time than needed, to the prejudice of other cases which could have productively used the time wasted. Here, the trial took five months of the court's time. Giving this case more time than was reasonably necessary was prejudicially taking off time from other cases that needed judicial attention just as well.

. . .

We are also not persuaded by [Petitioner's] argument that "the excluded evidence would have shown that the prosecution knowingly presented false or at least misleading testimony." The prosecution was ready to prove that Salazar was telling the truth had [Petitioner] been allowed to examine Salazar about the Farfan incident.

We conclude the trial court did not abuse its discretion in disallowing evidence relating to the Farfan homicide.

Resp. Ex. 1 at 25–34 (some alterations in original) (citations omitted).

In some circumstances, a trial court's restrictions on a defendant's presentation of evidence may violate the defendant's right to present a defense. That is because, "[w]hether rooted directly in the Due Process Clause of the Fourteenth Amendment or in the . . . Confrontation [Clause] of the Sixth Amendment, the Constitution guarantees criminal defendants 'a meaningful opportunity to present a complete defense.'" Crane v. Kentucky, 476 U.S. 683, 690 (1986) (citations omitted).

The right to present evidence, however, is not absolute.  See Taylor v. Illinois, 484 U.S. 400, 410

(1988) ("The accused does not have an unfettered right to offer testimony that is incompetent,

privileged, or otherwise inadmissible under standard rules of evidence.").  Although the defense

must be given a chance to expose an adverse witness's motivation in testifying, the trial judge

retains "wide latitude" to "impose reasonable limits on such cross-examination based on concerns

about, among other things, harassment, prejudice, confusion of the issues, the witness' safety, or

interrogation that is repetitive or only marginally relevant."  Delaware v. Van Arsdall, 475 U.S.

673, 679 (1986).

      The California Court of Appeal did not unreasonably apply federal law in holding that the

trial court did not violate Petitioner's right to present a defense by circumscribing any questioning

about the killing of Farfan.  Petitioner relies upon two U.S. Supreme Court cases, Crane and Van

Arsdall, which involved situations where the circumstances more compellingly outweighed the

state's interest in trial administration.  In Crane, the Supreme Court concluded, "on the facts of

th[e] case," that the state deprived the defendant of the opportunity to present his defense when the

state offered no valid justification for "the blanket exclusion" of "competent, reliable evidence"

that pertained to "the credibility of [the defendant's] confession" and, thus, was "central to the

defendant's claim of innocence."  476 U.S. at 690.  The Court highlighted the "peculiar

circumstances of th[e] case," in which the defendant's "entire defense was that there was no

physical evidence to link him to the crime and that, for a variety of reasons, his earlier admission

of guilt was not to be believed."  Id. at 691.  In Van Arsdall, the Supreme Court found

constitutional error because "the trial court prohibited *all* inquiry into the possibility that [the

prosecution's witness] would be biased as a result of the State's dismissal of his pending public

drunkenness charge."  475 U.S. at 679.  While recognizing that the defense is not entitled to put on

any cross-examination that it wishes, the Court explained that the trial court violated the

defendant's rights when the court "cut[] off all questioning about an event that the State conceded

ORDER DENYING PETITION FOR WRIT OF HABEAS CORPUS; DENYING CERTIFICATE
OF APPEALABILITY

20

United States District Court
Northern District of California

1    had taken place and that a jury might reasonably have found furnished the witness a motive for

2    favoring the prosecution in his testimony." Id.

3        It is not unreasonable to characterize Petitioner's case as materially different from Crane

4    and Van Arsdall. Here, the trial judge had a sufficient non-arbitrary basis to bar Petitioner's

5    questioning under section 352 of the California Evidence Code, which permits exclusion for

6    undue consumption of time on a collateral issue. Petitioner's proposed questions were designed to

7    cast doubt on Salazar's credibility by demonstrating a conflict between Salazar's and Arroyo's

8    stories about who, if anyone, had ordered a hit on Farfan. However, the prosecution did not call

9    Arroyo as a witness, so his version of events was not before the jury. And the prosecution was

10   ready to prove that Salazar's version of events was the correct one. Thus, allowing Petitioner's

11   questioning would have required a mini-trial on the killing of Farfan, "a crime with which

12   [Petitioner] was not charged," and these significant diversions would likely result in "jury

13   confusion and inordinate consumption of time." Resp. Ex. 1 at 33. This case is unlike Van

14   Arsdall because the questioning there related to an event that the prosecution conceded had taken

15   place. In this case, moreover, Petitioner cross-examined Salazar on a number of other topics and

16   had ample opportunity to argue that Salazar was lying. Therefore, introducing this testimony was

17   not as necessary as probing the motive of the prosecution's witness in Van Arsdall or attacking the

18   credibility of the defendant's confession in Crane. Indeed, in other cases, the Supreme Court has

19   expressed particular concern when the state rule is so broad as to prevent the admission of "the

20   only testimony available on a crucial issue." Washington v. Texas, 388 U.S. 14, 21 (1967). The

21   California Court of Appeal could reasonably credit these relevant differences between Petitioner's

22   case and the cited Supreme Court cases.

23       Petitioner separately contends that the trial court's exclusion was constitutionally improper

24   because it prevented Petitioner from showing that the prosecution presented Salazar's testimony

25   despite knowing that he was lying. It is true that a state violates due process when it knowingly

26   presents false evidence to obtain a conviction. See Napue v. Illinois, 360 U.S. 264, 269 (1959);

27

28   Case No.: 03-cv-02930-EJD
     ORDER DENYING PETITION FOR WRIT OF HABEAS CORPUS; DENYING CERTIFICATE
     OF APPEALABILITY

United States District Court
Northern District of California

1   see also Giglio v. United States, 405 U.S. 150, 153–54 (1972).  Petitioner cannot, however, make

2   out such a claim here.  Although the prosecution entered into plea agreements with both Salazar

3   and Arroyo, the prosecution did not call Arroyo as a witness, so the issue of whether Salazar or

4   Arroyo was telling the truth did not (and could not) arise at trial.[2]  And if the trial court allowed

5   Petitioner to admit testimony about the Farfan homicide, the prosecution intended to prove that

6   Salazar, not Arroyo, was telling the truth.  Therefore, as the California Court of Appeal reasoned,

7   the prosecution did not knowingly present any false testimony.  Resp. Ex. 1 at 34.  Accordingly,

8   the Court of Appeal did not unreasonably determine that the exclusion of Petitioner's Farfan-

9   related questions did not violate his Sixth and Fourteenth Amendment rights, and Petitioner is not

10  entitled to habeas relief on this claim.

11          3.      Cross-examination of John Kracht

12          Petitioner's third claim is that the trial court unduly restricted the scope of cross-

13  examination of one of the prosecution's witnesses, investigator John Kracht.  Pet. at 15–16.

14  Specifically, the trial court ruled that Petitioner's questions about whether Kracht closed an

15  investigation into a robbery involving Pablo Pena were irrelevant and tangential.  Resp. Ex. 1 at

16  36–37.  Petitioner asserts that these limitations violated his Sixth Amendment right to confront

17  witnesses and his Fourteenth Amendment right to due process.  Pet. at 15.

18          The California Court of Appeal rejected Petitioner's claim, explaining:

19          [Petitioner] contends the trial court violated his Sixth and Fourteenth Amendment
            rights to confrontation and due process by unduly restricting the scope of cross-
20          examination of John Kracht regarding the disposition of a case against Pena,
            which would have shown that [Petitioner] had no motive to agree to kill Rosas
21          and thus prejudiced his defense against the charges of murder and conspiracy to
            commit murder.  We disagree.
22

23

24

25  [2] Petitioner does not suggest that the prosecution failed to disclose that Salazar and Arroyo had
    provided opposing statements about the Farfan homicide to the prosecutors.  In the response,
26  Respondent represents that the prosecution fulfilled its duty by "disclos[ing] each statement" to
    the defense.  Resp. at 32 n.8.
27
    Case No.: 03-cv-02930-EJD
28  ORDER DENYING PETITION FOR WRIT OF HABEAS CORPUS; DENYING CERTIFICATE
    OF APPEALABILITY

Rosas was murdered on June 26, 1991, by assailants who were not identified. The prosecution's evidence showed that [Petitioner] authorized Rosas's murder because Rosas had identified Pena as the person who had earlier robbed Petra Gonzalez, who was the mother of Rosas's girlfriend. The prosecution's evidence consisted of Pena's confession, statements made by several [Nuestra Familia] members, and evidence of the actual robbery itself wherein Gonzalez identified Pena to the police as one of the robbers. Gonzalez testified that two masked men broke into her home on December 31, 1983, and that Rosas went to her defense. Gonzalez did not know who Pena was and did not recall if Pena was one of the intruders.

John Kracht, the district attorney's investigator, testified that he used to be employed by the San Jose Police Department and that, while employed as such, he had investigated the Rosas robbery and had spoken to Gonzalez. Gonzalez identified Pena's picture as that of one of the robbers. Gonzalez also told Kracht that Pena had held a knife to her neck and had cut her.

During cross-examination, the defense asked Kracht whether his reports with reference to the Rosas robbery investigation were closed; whether he ever testified at a trial involving Pena regarding the Rosas robbery; and whether he ever appeared in court "with reference to charges brought against Pablo Pena as a result of this incident." The prosecution objected to the questions on relevancy grounds. The court sustained the objections. Trujeque's counsel requested a hearing on the defense objection. The court granted the request, and a hearing was held out of the presence of the jury.

At the hearing, the defense stated, as an offer of proof, that Pena was not prosecuted for the Rosas robbery, and this lack of prosecution showed that the prosecution's theory was not viable. The defense further stated that because Pena was not prosecuted, "there never was any way that [Pena] would know that anything happened."

The court ruled that the objected questions were irrelevant, and, in any event, the relevancy of the questions was "greatly outweighed by undue consumption of time on a collateral issue, really."

We find no error. Pursuant to Evidence Code section 210, "relevant evidence" is evidence that has "any tendency in reason to prove or disprove any disputed fact that is of consequence to the determination of the action." Trial courts have wide discretion in determining the relevancy of evidence.

The fact that was of consequence which the defense sought to establish with the challenged questions was the viability of the prosecution theory that [Petitioner] authorized the murder of Rosas because Rosas had identified Pena as one of the robbers in the Rosas robbery. [Petitioner's] argument is that such theory was not

viable because Kracht's investigation of the Rosas robbery had been closed, and Kracht had not appeared in court in regard to any charges brought against Pena respecting the Rosas robbery.

We fail to see the logic of the argument.  The closure of Kracht's investigation, and the fact that Kracht never appeared nor testified at a trial involving the Rosas robbery, did not mean that Rosas was without other means of knowing that Pena was involved in the Rosas robbery.  Rosas's knowledge of Pena's participation could have come from sources other than Kracht's investigation or court testimony.  In fact, Rosas was present when the robbery took place, and even went to the defense of Gonzalez.  Pena, as one of the robbers, likely knew of Rosas's presence during the robbery and of Rosas's role in coming to the defense of Gonzalez.  There is evidence that in late June 1991, [Petitioner] told Salazar that there was a "green light" on Rosas because Rosas had "snitched on Pablo Pena, Panther."  Chavez testified that while he was in prison with Pena, Pena had told him that he (Pena) had robbed Rosas's home.  There is also evidence that after Rosas's murder, Shelton asked [Petitioner] about it, and [Petitioner's] reply was: "Fuck that punk, I just told them [Chavez and Salazar] to deal with it, that he [Rosas] had some situation with Panther [Pena]."

Because the questions of whether Kracht had closed his investigation and whether he had appeared or testified at a trial involving the Rosas robbery did not foreclose the prosecution theory that [Petitioner] had authorized the murder of Rosas because Rosas knew that Pena was involved in the Rosas robbery, the trial court did not exceed the bounds of reason, and therefore did not exceed its discretion, in sustaining the prosecution's objections to the challenged cross-examination questions on relevancy grounds.

Moreover, the trial court stated that, in any event, the relevancy of the questions was "greatly outweighed by undue consumption of time on a collateral issue." [Petitioner] has not seriously challenged this Evidence Code section 352 determination by the trial court, except to point out that only two questions were objected to.  It is not possible to tell, however, how many more questions on the subject might have been asked, and how much more time might have been spent by both sides on the issue, had no timely objections been made to the initial questions, and had not the trial court sustained the objections.

Resp. Ex. 1 at 34–37 (some alterations in original) (citation omitted).

As spelled out above, the question whether a trial court so restricted a defendant's presentation of evidence as to violate the right to present a defense implicates competing considerations.  On the one hand, the Sixth and Fourteenth Amendments "guarantee[] criminal defendants 'a meaningful opportunity to present a complete defense.'"  Crane, 476 U.S. at 690

1    (quoting <u>California v. Trombetta</u>, 467 U.S. 479, 485 (1984)). In the context of impeachment, the

2    defense must be given "reasonable latitude" to cross-examine witnesses in order "to place the

3    witness in his proper setting and put the weight of his testimony and his credibility to a test."

4    <u>Smith v. Illinois</u>, 390 U.S. 129, 132 (1968) (quoting <u>Alford v. United States</u>, 282 U.S. 687, 692

5    (1931)). On the other hand, trial judges retain "wide latitude" to "impose reasonable limits on

6    such cross-examination based on concerns about, among other things, harassment, prejudice,

7    confusion of the issues, the witness' safety, or interrogation that is repetitive or only marginally

8    relevant." <u>Van Arsdall</u>, 475 U.S. at 679; <u>see also</u> <u>United States v. Scheffer</u>, 523 U.S. 303, 308

9    (1998) ("A defendant's right to present relevant evidence is not unlimited, but rather is subject to

10   reasonable restrictions."). State rules excluding evidence from criminal trials therefore "do not

11   abridge an accused's right to present a defense" as long as they are not arbitrary or

12   disproportionate. <u>Scheffer</u>, 523 U.S. at 308.

13          The California Court of Appeal did not unreasonably apply these cases in concluding that

14   the trial court did not unduly restrict the scope of Petitioner's cross-examination of Kracht. In

15   sustaining the objections to Petitioner's cross-examination questions, the trial court relied on

16   sections of the California Evidence Code that allow exclusion for lack of relevance and undue

17   consumption of time on a collateral issue. And the trial court's rulings in those regards are

18   reasonable, non-arbitrary limits on the scope of cross-examination because Petitioner sought to ask

19   questions that had minimal, if any, relevance. The prosecution's theory of the case was that

20   Petitioner's motive to have Rosas killed was that Rosas had snitched on a Nuestra Familia

21   member, Pena, by identifying him as the perpetrator of a robbery. Petitioner desired to cross-

22   examine investigator Kracht about the disposition of Pena's robbery prosecution—namely, that

23   Kracht had closed the case and that Kracht had not appeared or testified at a trial involving the

24   robbery. However, the fact that Pena was not prosecuted for robbery does not answer whether

25   Rosas knew that Pena committed the robbery or whether Rosas identified Pena as the robber. The

26   Court of Appeal documented other ways that Rosas could have known of Pena's involvement—

27

28   Case No.: 03-cv-02930-EJD
     ORDER DENYING PETITION FOR WRIT OF HABEAS CORPUS; DENYING CERTIFICATE
     OF APPEALABILITY

including that Rosas was present during the robbery and that Pena shared that information in prison—and pointed to evidence supporting the conclusion that Petitioner ordered Rosas's murder for snitching on Pena. Resp. Ex. 1 at 36. The prosecution also presented evidence that Petitioner confessed that he ordered Rosas's murder because "[Rosas] had some situation with [Pena]." Resp. Ex. 1 at 36. Accordingly, the Court of Appeal did not unreasonably determine that the exclusion of Petitioner's cross-examination questions did not violate his Sixth and Fourteenth Amendment rights, and Petitioner is not entitled to habeas relief on this claim.

### 4. Failure to instruct on second degree murder

Petitioner's fourth claim is that, based on the substantial evidence that Petitioner acted in a rash manner in responding to a call from Chavez, the trial court had a sua sponte duty to instruct the jury on second degree murder. Pet. at 16–17. According to Petitioner, the trial court's failure to instruct amounted to a violation of his Sixth Amendment right to present a defense and to a trial by an impartial jury as well as his Fourteenth Amendment right to due process. Pet. at 17.

The California Court of Appeal rejected Petitioner's claim, explaining:

> [Petitioner] contends the trial court violated [Petitioner's] state and federal constitutional rights to due process and an impartial jury trial by refusing to instruct the jury on the lesser included offense of second degree murder with respect to . . . the murder of Rosas in count 12. The contention is without merit.
>
> . . .
>
> As to count 12, the Rosas murder, [Petitioner] requested the trial court to instruct the jury on second degree murder. The prosecution objected, arguing that, as to that murder, [Petitioner] was either guilty of conspiracy to commit first degree murder or not guilty of any crime. The court denied [Petitioner's] request, stating: "As it relates to [Petitioner], . . . it's either a first degree murder or it's not a first degree murder. I expect—or based on what I've observed during the course of this trial, that the credibility of witnesses who will testify about [Petitioner] will be attacked. The argument is going to be he didn't commit any crime. To the extent he did, the evidence suggests in my opinion that if there was a crime, it's a first degree murder. Therefore, I don't believe it's appropriate to instruct on second degree murder."

As the court expected, [Petitioner's] counsel subsequently argued to the jury that [Petitioner] was not guilty at all of the Rosas homicide.

The trial court's duty to instruct on lesser included offenses has been summarized, thus: "'It is settled that in criminal cases, even in the absence of a request, the trial court must instruct on the general principles of law relevant to the issues raised by the evidence. The general principles of law governing the case are those principles closely and openly connected with the facts before the court, and which are necessary for the jury's understanding of the case.' That obligation has been held to include giving instructions on lesser included offenses when the evidence raises a question as to whether all of the elements of the charged offense were present but not when there is no evidence that the offense was less than that charged. The obligation to instruct on lesser included offenses exists even when as a matter of trial tactics a defendant not only fails to request the instruction but expressly objects to its being given. Just as the People have no legitimate interest in obtaining a conviction of a greater offense than that established by the evidence, a defendant has no right to an acquittal when that evidence is sufficient to establish a lesser included offense."

Further, "'"[i]t has long been settled that the trial court need not, even if requested, instruct the jury on the existence and definition of a lesser and included offense if the evidence was such that the defendant, if guilty at all, was guilty of something beyond the lesser offense."'"

[Petitioner] claims that he acted rashly, and therefore without deliberation or premeditation, when he approved the Rosas murder. The claim is not supported by the facts on record.

The record shows that in late June 1991, [Petitioner] told Salazar that there was a "green light" on Rosas because Rosas had "snitched on Pablo Pena, Panther." However, before the green light was executed, [Petitioner] wanted confirming "paperwork" because if Rosas was killed and [Petitioner] was wrong, [Petitioner] would himself be killed. Chavez testified that on the night Rosas was killed, he received a telephone call from Roy Reveles and Tim Hernandez asking him for authority "[t]o hit Little Eli [Rosas]." Chavez told Hernandez that he "didn't have the authority to make any decisions." Chavez then contacted Salazar, who contacted [Petitioner]. In a three-way telephone discussion with Salazar and [Petitioner], Chavez told [Petitioner] that Reveles and Hernandez had asked for his authority to kill Rosas and that he had told them that he "couldn't make that decision." Chavez asked [Petitioner] what he was to do. [Petitioner] told Chavez to "do what you got to do," which meant to "kill [Rosas]."

This three-way telephone conversation took place while [Petitioner] was at the home of Michelle Valderama, his sister-in-law. Valderama overheard [Petitioner's] side of the conversation, including the name "Eli," which was how

Rosas was called, and [Petitioner's] instruction to the caller to "just do what you got to do," and for the caller to let him know what happened.

Subsequently, when [Petitioner] and Shelton were at San Quentin, [Petitioner] told Shelton, in referring to Rosas: "Fuck that punk, I just told them [Chavez and Salazar] to deal with it, that he [Rosas] had some situation with Panther [Pena]," and that Rosas was behind "some drug deal that some drugs were involved and that [Rosas] had supposedly had snitched on [Pena] who's also [a Nuestra Familia] member."

The foregoing facts demonstrate premeditation and deliberation, not rashness. If the jury accepted the facts as true, the killing of Rosas was murder of the first degree. If the jury did not believe the foregoing evidence, particularly that relating to the three-way conversation among [Petitioner], Chavez, and Salazar, then [Petitioner] was not guilty of any crime. There was no middle ground.

Accordingly, we conclude the trial court did not err in refusing to give the second degree murder lesser included offense instruction.

Resp. Ex. 1 at 37–40 (some alterations in original) (citations omitted).

In some circumstances, failure to give requested instructions violates due process. Specifically, the U.S. Supreme Court has held that in a capital case, where the evidence supports a verdict on a lesser-included offense, failure to instruct a jury on that lesser-included offense constitutes a violation of due process. Hopper v. Evans, 456 U.S. 605, 610–11 (1982); Beck v. Alabama, 447 U.S. 625, 634–38 (1980). However, the Supreme Court has limited application of that rule to the capital context. In 1973, the Court explained that it "ha[d] never explicitly held that the Due Process Clause of the Fifth Amendment guarantees the right of a defendant to have the jury instructed on a lesser included offense." Keeble v. United States, 412 U.S. 205, 213 (1973). When the Court later held that due process requires giving such an instruction in capital cases, the Court made clear that it was "not decid[ing] whether the Due Process Clause would require the giving of such instructions in a noncapital case." Beck, 447 U.S. at 638 n.14. Based on those express reservations, the California Court of Appeal could reasonably decline to extend Hopper and Beck to this noncapital case. Therefore, the Court of Appeal did not unreasonably

apply <u>Hopper</u> or <u>Beck</u> in concluding that the trial court did not deprive Petitioner of due process by refusing to instruct the jury on second degree murder.[3]

Petitioner also cites two Ninth Circuit decisions—<u>United States v. Escobar de Bright</u>, 742 F.2d 1196, 1201–02 (9th Cir. 1984), and <u>United States v. Unruh</u>, 855 F.2d 1363, 1372 (9th Cir. 1987)—for the proposition that "[f]ailure to instruct upon the defendant's theory of the case, where there is evidence to support the instruction, is a violation of the Sixth Amendment right to present a defense and to a trial by jury, and the Fourteenth Amendment right to due process." Pet. at 17. As noted above, circuit precedent cannot "refine or sharpen a general principle of Supreme Court jurisprudence into a specific legal rule that [the U.S. Supreme] Court has not announced." <u>Marshall</u>, 569 U.S. at 64. <u>Escobar de Bright</u> and <u>Unruh</u> were both direct appeals, and neither purports to hold that the U.S. Supreme Court has "clearly established" that failing to instruct on the defendant's theory is a constitutional violation, let alone that that rule derives from U.S. Supreme Court precedent at all. These cases cannot serve as the basis for granting habeas relief to Petitioner. <u>See</u> <u>Marshall</u>, 569 U.S. at 64.

In any event, even if the above-referenced cases applied in this instance, Petitioner would not be entitled to habeas relief. All of the cases hold that an instruction is necessary only if the evidence supports a verdict on a lesser-included offense, but, as the California Court of Appeal reasoned, the evidence in Petitioner's case does not support a verdict on second degree murder. Petitioner points to only two facts in the record: (1) he was in bed when the three-way call came in and (2) he told Chavez on the phone, "You know what time it is, Louie? You shouldn't even have to make this call." Resp. Ex. 6, RT 17373, 12221. On their own, those facts do not indicate that Petitioner "was obscured or disturbed by passion to such an extent as would cause the ordinarily

---

[3] Petitioner's reliance on <u>Rose v. Clark</u>, 478 U.S. 570, 578 (1986), is misplaced. In the cited passage, the U.S. Supreme Court held that where a trial judge directs a verdict for the prosecution in a criminal jury trial, harmless-error analysis does not apply because "the wrong entity judged the defendant guilty." <u>Id.</u> at 578. Here, there is no contention that the trial judge entered a judgment of conviction or directed the jury to reach a particular verdict.

Case No.: 03-cv-02930-EJD
ORDER DENYING PETITION FOR WRIT OF HABEAS CORPUS; DENYING CERTIFICATE OF APPEALABILITY

reasonable person of average disposition to act rashly and without deliberation and reflection, and from such passion rather than from judgment." People v. Lee, 971 P.2d 1001, 1007 (Cal. 1999) (citation omitted). Moreover, the California Court of Appeal detailed the other facts, including testimony from multiple witnesses that Petitioner had ordered the hit on Rosas and testimony from one witness that Petitioner had admitted to authorizing the murder, that strongly support premeditation and deliberation, not rashness. Accordingly, Petitioner has not shown entitlement to habeas relief on this claim.

     5.    Failure to instruct jury to decide whether one or multiple conspiracies existed

Petitioner's fifth claim is that the trial court erred when it failed to instruct (and therefore the jury did not decide) whether one or multiple conspiracies existed. Pet. at 17–18. Petitioner's argument appears to be that his Sixth Amendment right to trial by jury and his Fourteenth Amendment right to due process were violated because the jury did not determine a material fact necessary for guilt—namely, whether there was one conspiracy or multiple conspiracies. Pet. at 17–18.

The California Court of Appeal rejected Petitioner's claim, explaining:

[Petitioner] contends the trial court deprived [Petitioner] of his state and federal constitutional rights to a trial by jury and due process by failing to instruct the jury to determine the essential factual question whether one or multiple conspiracies existed. We disagree.

On conspiracy, the defense proposed a modified version of CALJIC No. 6.10, to read as follows: "If you find the existence of a conspiracy beyond a reasonable doubt, you must determine whether a single or multiple conspiracies have been proven. If there was one overall agreement among the various parties to perform various functions to carry out the objectives of the conspiracy, then there is but a single conspiracy. If there were separate agreements each of which had its own distinct, illegal end and which were not drawn together in a single, overall, comprehensive plan, then each such agreement is a separate conspiracy. [¶] The indictment alleges only a single count of conspiracy. If you find the existence of multiple conspiracies, a defendant may be found guilty of conspiracy if the proof shows beyond a reasonable doubt that he participated in one or more of the conspiracies. However, to find a defendant guilty of conspiracy you must unanimously agree as to which conspiracy or conspiracies he participated in. It is

not necessary that the particular conspiracy or conspiracies agreed upon be stated in your verdict."

The prosecution objected to this proposed instruction, arguing that while there was one umbrella conspiracy, which was the NF, "there have to be some specific efforts on the part of each conspirator to join in that conspiracy as a—if you would like, a mini conspiracy within the ambit of the larger one. Obviously, the larger one is the [Nuestra Familia] doing evil things as a group, but we have never gone so far as to say that simply joining the [Nuestra Familia] makes one responsible for all of the crimes then committed by the gang itself, necessarily. But in terms of the umbrella conspiracy and for [Evidence Code section] 1223 there is such an umbrella conspiracy to commit crimes, the named crimes in general. But that's why in terms of the verdict form and also the accomplice stuff and all of the rest of it, we have specific murder object, object crimes, that is, the murder of certain specific individuals. The subjects of the object crimes, if you will."

The court refused the proposed instruction, stating that it found the last two paragraphs thereof, which deal with multiple conspiracies, "potentially very confusing."

The next day, the court announced: ". . . I've rethought my position. As you know, I've indicated before that I felt that the jury would not only have to find unanimously which of the target crimes were the subject of the conspiracy, but I went on to indicate that I felt they would have to be unanimous as to which particular event associated with the target crimes, for example, which murder. And in keeping with that position, I felt that the jury verdict forms should be specific as to possible victims, where they could not only demonstrate their unanimous opinion concerning the target crime, but which particular event. [¶] After reconsidering, I've come to the conclusion I was wrong. And it's my opinion that the jury need only be unanimous about the target crimes, that they don't have to unanimously agree as to which event, nor does that have to be reflected in the jury verdict form, whether it be which murder or which robbery or which distribution of controlled substances. [¶] I am not inclined, still, to give the instructions requested by the defense dealing with multiple conspiracies, and the record is clear as to the proposed instructions which I rejected already."

The court then gave the jury the following instruction on conspiracy (CALJIC No. 6.10): "A conspiracy is an agreement entered into between two or more persons with the specific intent to agree to commit an object crime or crimes and with the further specific intent to commit the object crime or crimes followed by an overt act committed in this state by one or more of the parties for the purpose of accomplishing the object or objects of the agreement. Conspiracy is a crime. [¶] In order to find a defendant guilty of conspiracy, in addition to proof of the unlawful agreement and specific intent, there must be proof of the commission of

Case No.: 03-cv-02930-EJD
ORDER DENYING PETITION FOR WRIT OF HABEAS CORPUS; DENYING CERTIFICATE OF APPEALABILITY
31

United States District Court
Northern District of California

at least one of the acts alleged in the indictment to be an overt act and that the act committed was an overt act. It is not necessary to the guilt of any particular defendant that defendant personally committed the overt act, if he was one of the conspirators when the alleged overt act was committed. [¶] The term 'overt act' means any step taken or act committed by one or more of the conspirators which goes beyond mere planning or agreement to commit a crime and which step or act is done in furtherance of the accomplishment of the object of the conspiracy. [¶] To be an 'overt act,' the step taken or act committed need not, in and of itself, constitute the crime or even an attempt to commit the crime which is the ultimate object of the conspiracy. Nor is it required that the step or act, in and of itself, be a criminal or an unlawful act."

The jury was also instructed pursuant to CALJIC No. 6.25: "In order to find a defendant guilty of the crime of conspiracy, you must find beyond a reasonable doubt that a defendant conspired to commit one or more of the object crimes of the conspiracy, and you also must unanimously agree as to which particular crime or crimes he conspired to commit. [¶] If you find defendant guilty of conspiracy, you will then include a finding on the question as to which alleged object crimes you unanimously agree a defendant conspired to commit. A form will be supplied for that purpose for each defendant."

In addition, because of the allegation in the indictment that the conspiracy was committed for the benefit of a criminal street gang, the court instructed the jury that "[i]f you find a defendant guilty of any crime charged, then you must decide if he committed that crime or those crimes for the benefit of, at the direction of, or in association with a criminal street gang."

[Petitioner] argues that the question of whether one or more conspiracies existed in this case was a question of fact for the jury to determine, and, therefore, the trial court violated his state and federal constitutional rights to a trial by jury and due process when that court refused his request to instruct the jury to "determine whether a single or multiple conspiracies had been proven, and to agree unanimously as to which conspiracy or conspiracies each defendant participated in." We disagree.

. . . "'The crime of conspiracy is defined in the Penal Code as "two or more persons conspir[ing]" "[t]o commit any crime," together with proof of the commission of an overt act "by one or more of the parties to such an agreement" in furtherance thereof. "Conspiracy is a 'specific intent' crime. . . . The specific intent required divides logically into two elements: (a) the intent to agree, or conspire, and (b) the intent to commit the offense which is the object of the conspiracy . . . . To sustain a conviction for conspiracy to commit a particular offense, the prosecution must show not only that the conspirators intended to agree *but also that they intended to commit the elements of that offense*.""'"

In a conspiracy, "[t]he gist of the offense is the unlawful agreement between the conspirators to do an act contrary to law, accompanied by an overt act to at least start to carry the conspiracy into effect." . . . "'[O]ne agreement gives rise to only a single offense, despite any multiplicity of objects.'"

In *Braverman v. United States* (1942) 317 U.S. 49, 53–54 (*Braverman*), where the defendants were charged with the illegal manufacture, transportation and distribution of liquor, and each count charged a conspiracy to violate a different penal statute, and where it was conceded that the different violations were all pursuant to a single overall agreement, the United States Supreme Court concluded that there was only one conspiracy, reasoning: "The gist of the crime of conspiracy as defined by the statute is the agreement or confederation of the conspirators to commit one or more unlawful acts 'where one or more of such parties do any act to effect the object of the conspiracy.' The overt act, without proof of which a charge of conspiracy cannot be submitted to the jury, may be that of only a single one of the conspirators and need not be itself a crime. But it is unimportant, for present purposes, whether we regard the overt act as a part of the crime which the statute defines and makes punishable, or as something apart from it, either an indispensable mode of corroborating the existence of the conspiracy or a device for affording a locus poenitentiae. [¶] For when a single agreement to commit one or more substantive crimes is evidenced by an overt act, as the statute requires, the precise nature and extent of the conspiracy must be determined by reference to the agreement which embraces and defines its objects. Whether the object of a single agreement is to commit one or many crimes, it is in either case that agreement which constitutes the conspiracy which the statute punishes. The one agreement cannot be taken to be several agreements and hence several conspiracies because it envisages the violation of several statutes rather than one. [¶] The allegation in a single count of a conspiracy to commit several crimes is not duplicitous, for 'The conspiracy is the crime, and that is one, however diverse its objects.' A conspiracy is not the commission of the crime which it contemplates, and neither violates nor 'arises under' the statute whose violation is its object. Since the single continuing agreement, which is the conspiracy here, thus embraces its criminal objects, it differs from successive acts which violate a single penal statute and from a single act which violates two statutes. The single agreement is the prohibited conspiracy, and however diverse its objects it violates but a single statute . . . . For such a violation, only the single penalty prescribed by the statute can be imposed."

Here, the prosecution charged [Petitioner] with only one count of conspiracy. Assuming that more conspiracy counts could have been charged under the facts, the decision to charge [Petitioner] with only one conspiracy count was a prosecutorial charging discretion that we do not review. The exercise of that discretion involves questions of prosecutorial policies and judgment, not questions of fact for the jury to determine.

Moreover, we fail to see how charging [Petitioner] with one count of conspiracy, instead of multiple counts, could prejudice [Petitioner]. Any error would therefore be harmless.

Furthermore, assuming there were multiple conspiracies, we do not see how the existence of the uncharged conspiracies can result in the reversal of a guilty finding in the one conspiracy that was charged. If the evidence submitted to the jury supports the guilty finding on the charged conspiracy, the fact that the same evidence might also have supported other conspiracies, which were not charged, is of no consequence to the issue of innocence or guilt on the charged conspiracy.

In fact, the record evidence points only to one conspiracy—the agreement to establish the [Nuestra Familia] as a criminal gang to commit murder, robbery, burglary, extortion, and drug trafficking, among other crimes. Within that umbrella conspiracy were sub-conspiracies to commit specific crimes. However, the commission of the specific crimes, and the drawing up of plans required to commit them, were all in pursuance of the overriding purpose of the NF, which was to establish power through the use of crime, force, and fear, and to use that power to further strengthen and perpetuate itself by killing its enemies, raising money for the gang, and instilling obedience and discipline among its members by killing members who break its rules. Thus, Rosas was killed because he had "snitched on Pablo Pena, Panther." The decision to kill Rosas, being one in furtherance of the overriding purpose of the conspiracy, was part of the overall conspiracy, and hence cannot be the basis for filing a separate charge of conspiracy.

It has been held that the overall scheme need not be complete in all its aspects at the time it is formed. "A conspiracy is not necessarily a single event which unalterably takes place at a particular point in time when the participants reach a formal agreement; it may be flexible, occurring over a period of time and changing in response to changed circumstances." "The general test is whether there was 'one overall agreement' to perform various functions to achieve the objectives of the conspiracy. Performance of separate crimes or separate acts in furtherance of a conspiracy is not inconsistent with a 'single overall agreement.' The general test also comprehends the existence of subgroups or subagreements."

Because the Rosas murder did not provide evidence of a conspiracy separate from the overriding [Nuestra Familia] conspiracy, it did not support [Petitioner's] request for multiple conspiracies instruction. A trial court is required to instruct the jury to determine whether a single or multiple conspiracies exist only when there is evidence to support alternative findings.

In *Zemek*, the Ninth Circuit applied a four-factor analysis to determine whether the crimes were committed pursuant to an overall scheme. These factors are: (1) the nature of the scheme; (2) the identity of the participants; (3) the quality,

frequency, and duration of each conspirator's transactions; and (4) the commonality of times and goals.

We are not pointed to any California case adopting the *Zemek* factors, nor has our own research disclosed such a case. Nonetheless, even applying the *Zemek* factors, as [Petitioner] suggests we do, we find in the record no convincing evidence to support [Petitioner's] claim of multiple conspiracies.

First, on the nature of the scheme, [Nuestra Familia] was organized primarily as a prison gang. However, it also functioned on the streets, engaging in various criminal activities. [Nuestra Familia]'s basic purpose was to make money through crime for its members in and out of prison. [Nuestra Familia] members pledge allegiance to act in concert and to commit crimes, including murder, for the gang. [Nuestra Familia] has a written constitution, and its rules require the members to cover up each other's crimes. The only way to get out of the gang is to die, be killed, or be a dropout/snitch. [Nuestra Familia]'s rule is "blood in, blood out," which means that one becomes a member of [Nuestra Familia] by spilling blood, preferably by killing, and leaves the gang by being killed as a coward, traitor, or deserter. A member may be killed by the gang for refusal to follow a superior's orders, or for failure to attend meetings.

On the identity of participants, members participate in whatever criminal activities their superiors order them to do. There is common overlapping of crime assignments.

On the quality of the frequency and duration of a conspirator's transactions, the members are committed to each other in a continuing relationship forged by the bond of "blood in, blood out." NF's written constitution provides for a ranking system where those in higher ranks issue orders to those in lower ranks, and where the penalty for disobeying the orders of a superior is death.

On the commonality of time and goals, the time period for the conspiracy in this case was two and a half years. The goals of the gang, which included making money for its members in and out of prison through criminal activities, such as murder, robbery, and drug trafficking, were shared by all the members.

The four *Zemek* factors to distinguish a single conspiracy from multiple conspiracies all point to a single conspiracy in this case.

We conclude the trial court's instructions were consistent with the law on conspiracy, which is that a single agreement to commit a number of crimes is only one conspiracy, regardless of the number of crimes sought to be committed, or that are committed, under that conspiracy.

. . .

Case No.: 03-cv-02930-EJD
ORDER DENYING PETITION FOR WRIT OF HABEAS CORPUS; DENYING CERTIFICATE OF APPEALABILITY

> We conclude the trial court did not err in failing to instruct the jury to determine whether one or multiple conspiracies existed in this case.

Resp. Ex. 1 at 40–49 (some alterations in original) (citations omitted).

The constitutional basis for Petitioner's claim is unclear.  Petitioner asserts that the trial court should have directed the jury to decide whether one conspiracy or multiple conspiracies existed.  He points to the U.S. Supreme Court's decision in In re Winship, which holds that "the Due Process Clause protects the accused against conviction except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which he is charged."  397 U.S. 358, 364 (1970).  The Court fails to see how that holding is implicated in Petitioner's case.  As the California Court of Appeal noted, the prosecution charged Petitioner with only one count of conspiracy.  Such charging decisions generally are not reviewable.  United States v. Armstrong, 517 U.S. 456, 464 (1996).  Because Petitioner was charged with only one count of conspiracy and the prosecution's theory of the case was that there was a single conspiracy, the jury did not need to decide whether there were multiple conspiracies.  Instead, the jury was asked to determine whether the prosecution had established beyond a reasonable doubt the elements of a single conspiracy, and the jury returned a verdict that the prosecution met its burden.  Thus, the jury found all facts necessary to constitute the crime of conspiracy under the applicable standard.

More broadly, Petitioner seems to contest the California Court of Appeal's holding that the facts of Petitioner's case qualify as a single conspiracy.  Pet. at 18–20.  But Petitioner does not explain how that challenge presents a constitutional issue.  Although the Constitution requires that each necessary element of the offense be proven beyond a reasonable doubt, "the state legislature's definition of the elements of the offense is usually dispositive."  McMillan v. Pennsylvania, 477 U.S. 79, 85 (1986).  Here, the Court of Appeal interpreted the California crime of conspiracy to encompass an agreement to commit multiple object offenses.  Based on that understanding of state law, Petitioner was not entitled to have the jury instructed in the manner he asserted.  Finally, Petitioner cannot override the Court of Appeal's state-law decision by asking

Case No.: 03-cv-02930-EJD
ORDER DENYING PETITION FOR WRIT OF HABEAS CORPUS; DENYING CERTIFICATE OF APPEALABILITY

this Court to apply the non-constitutional methodologies for distinguishing between conspiracies used by the Supreme Court in <u>Kotteakos v. United States</u>, 328 U.S. 750, 754–55 (1946), or the Ninth Circuit in <u>United States v. Zemek</u>, 634 F.2d 1159, 1167–68 (9th Cir. 1980). Petitioner's challenge to the conspiracy instruction fails, and he is not entitled to habeas relief on this claim.

      6.      <u>Failure to provide unanimity instruction</u>

Petitioner's sixth claim is that the trial court erred when it failed to instruct the jury to unanimously agree on the facts underlying the conspiracy. Pet. at 20–22. Without such a unanimity instruction, Petitioner contends, it is "impossible to determine whether the jury unanimously agreed as to whom [Petitioner] conspired to murder." Pet. at 21. Petitioner argues that his Sixth Amendment right to trial by jury and his Fourteenth Amendment right to due process were violated because the jury may not have unanimously agreed that Petitioner committed each element of the underlying conspiracy charge. Pet. at 21.

The California Court of Appeal rejected Petitioner's claim, explaining:

[Petitioner] contends he was deprived of his Sixth and Fourteenth Amendment rights to a jury trial and due process by the trial court's refusal to instruct the jury to unanimously agree on the facts underlying the elements of the conspiracy, an error that is reversible because it is impossible to determine whether the jury unanimously agreed as to whom [Petitioner] conspired to murder. We disagree.

. . .

Because the agreement is the conspiracy, the diversity of the crimes that may be the object of the agreement should be of little, if any, consequence. Proof that the agreement has crime as its object should be enough. So long as there is unanimity that crime was the object of the agreement, conspiracy is established regardless of whether some jurors believe that crime to be murder and others believe that crime to be something else. "A requirement of jury unanimity typically applies to acts that could have been charged as separate offenses." . . . "[I]f only one criminal offense could exist as a result of the commission of various acts, the jury need not agree on which particular act (or legal theory) a criminal conviction is based, provided the jurors unanimously agree that all elements of the criminal offense are proved beyond a reasonable doubt."

. . . "It matters not that jurors may disagree over the theory of the crime, for example, whether the situation involves felony murder or premeditated murder.

Nor does it matter that they disagree on the theory of participation, for example, whether there was direct participation or aiding and abetting or coconspiracy. Nor does it matter that they disagree about the facts proving any of these theories. If each juror concludes, based on legally applicable theories supported by substantial evidence, that the defendant is guilty of the charged offense, the defendant is properly found guilty even if the jurors disagree about the particular theories or facts."

. . . "In California it is unnecessary jurors unanimously agree on the theory of criminal culpability supporting their unanimous conclusion of guilt . . . . [¶] . . . [¶] . . . [W]here there is a single offense and a single charge, it is the task of each juror to conclude, based perhaps on very different theories, whether the defendant is guilty or not guilty. It is simply of no consequence that some jurors believe the defendant is guilty based on one theory while others believe he is guilty on another even when the theories may be based on very different and even contradictory conclusions concerning, for example, the defendant's basic intent in committing the crime."

[T]he California Supreme Court explained: "It is settled that as long as each juror is convinced beyond a reasonable doubt that defendant is guilty of murder as that offense is defined by statute, it need not decide unanimously by which theory he is guilty. More specifically, the jury need not decide unanimously whether defendant was guilty as the aider and abettor or as the direct perpetrator. This rule of state law passes federal constitutional muster. [¶] . . . [¶] Not only is there no unanimity requirement as to the theory of guilt, the individual jurors themselves need not choose among the theories, so long as each is convinced of guilt. Sometimes, as probably occurred here, the jury simply cannot decide beyond a reasonable doubt exactly who did what. There may be a reasonable doubt that the defendant was the direct perpetrator, and a similar doubt that he was the aider and abettor, but no such doubt that he was one or the other."

. . . "In analyzing the unanimity question in a robbery case, one Court of Appeal used this example. "'Assume a robbery with two masked participants in a store, one as the gunman and one as the lookout. If one witness makes a voice identification of the defendant as the gunman who demanded money, but other evidence, such as a fingerprint, suggests the defendant was actually holding the door open as lookout, the jury would be faced with the same theories presented in this case: find the defendant was the gunman and therefore a direct perpetrator, or find he was at the door and therefore an aider and abettor. Either way he would be guilty of robbery." If 12 jurors must agree on the role played by the defendant, the defendant may go free, even if the jurors all agree defendant committed the crime. That result is absurd.' Equally absurd would be to let the defendant go free because each individual juror had a reasonable doubt as to his exact role."

[T]he California Supreme Court had already observed: "If [defendant] intended that only possession of the property should pass at the time of the sale, defendant was guilty of larceny by trick or device, but if [defendant] intended that title should pass, defendant was guilty of obtaining property by false pretenses. Irrespective of [defendant's] intent, however, defendant could be found guilty of theft by one means or another, and since by the verdict the jury determined that he did fraudulently appropriate the property, it is immaterial whether or not they agreed as to the technical pigeonhole into which the theft fell."

Here, [Petitioner] was convicted of one conspiracy. The indictment described that conspiracy as a conspiracy to commit various crimes. Because any one of the crimes that was the object of the conspiracy was sufficient to establish the conspiracy, there were multiple theories upon which the prosecution could proceed. The existence of such multiple theories precluded a unanimity instruction. A unanimity instruction is inappropriate where multiple theories may provide the basis for a guilty verdict on one discrete criminal event.

. . .

Here, the specific crimes that constitute the object of the conspiracy are not elements of the conspiracy. Rather, they are the means by which the purpose of the conspiracy was to be achieved. Accordingly, the . . . requirement of jury unanimity does not apply to them.

Recently, . . . the California Supreme Court settled the question of "whether the jury must unanimously agree on a specific overt act," by holding that "the jury need not agree on a specific overt act as long as it unanimously finds beyond a reasonable doubt that some conspirator committed an overt act in furtherance of the conspiracy."

We conclude the trial court did not err when it refused to instruct the jury that it must unanimously decide whom, if anyone, [Petitioner] conspired to murder.

In any event, any error was invited. The record reflects that the prosecutor informed the court that it had prepared verdict forms that "sought to identify the targets for the conspiracy to commit murder," adding: "We still think there is an umbrella conspiracy and it's pretty obvious that there is. The [Nuestra Familia] is a group and they get together and they do all of these nefarious things. That's the object. But when it comes down to the particular subject matter of who they're planning to murder, that's why we put in the specific subjects of that particular object, object crime, otherwise, we think that we're in trouble on appeal." The attorney for codefendant Lopez argued to the court that the jury should only have to specify which of the object crimes a defendant conspired to commit, not the specific victim of that object crime. The prosecutor repeated that he wished the verdict form to specify whom, if anyone, a defendant conspired to kill.

The next day, counsel for Lopez objected to the prosecutor's proposed verdict, arguing that it was inconsistent to require specification for the target crime of murder and not for the other target crimes, which had more than one victim. [Petitioner] joined Lopez's objection. The court, which had earlier agreed with the prosecution on what the verdict form should ask the jury to indicate, reversed itself and sustained [Petitioner's] and Lopez's objection, stating: "After reconsidering, I've come to the conclusion I was wrong. And it's my opinion that the jury need only be unanimous about the target crime, that they don't have to unanimously agree as to which event, nor does that have to be reflected in the jury verdict form, whether it be which murder or which robbery or which distribution of controlled substances."

Any error was therefore invited; consequently, [Petitioner] cannot complain.

Any error was also harmless. There is a split of authority on the proper standard for reviewing prejudice when the trial court fails to give a unanimity instruction. Some cases hold that the prejudice must be deemed harmless beyond a reasonable doubt under *Chapman v. California* (1967) 386 U.S. 18, 24. Other cases hold that the test is as enunciated in *People v. Watson* (1956) 299 P.2d 243, which is whether "it is reasonably probable that a result more favorable to the appealing party would have been reached in the absence of the error."

We think *Watson* provides the correct standard on the issue. That is because the requirement for jury unanimity in a criminal prosecution is a state constitutional requirement. The United States Supreme Court "has never held jury unanimity to be a requisite of due process of law. Indeed, the Court has more than once expressly said that '[i]n criminal cases due process of law is not denied by a state law . . . which dispenses with the necessity of . . . unanimity in the verdict.'" . . . There being no right to a unanimous verdict under the United States Constitution, the question of whether [Petitioner] was entitled to a unanimity instruction is a state, not a federal, issue.

In any event, the jury found [Petitioner] guilty of the murder of Rosas. On the record facts, which show that [Petitioner's] participation in the murder of Rosas was in authorizing the murder, and there being no evidence in the record that [Petitioner] actually participated in the murder, or, being present, aided and abetted in the commission thereof, the guilty verdict on [Petitioner] for the murder of Rosas could only have been by reason of the jury unanimously finding that [Petitioner] had conspired to murder Rosas. Because of this implicit unanimous finding of conspiracy, it is not reasonably probable that [Petitioner] would have obtained a more favorable verdict had the unanimity instruction in question been given. For the same reason, any error was harmless even if the standard applied were the *Chapman* standard of harmless error beyond a reasonable doubt.

Resp. Ex. 1 at 49–57 (some alterations in original) (citations omitted).

Case No.: 03-cv-02930-EJD
ORDER DENYING PETITION FOR WRIT OF HABEAS CORPUS; DENYING CERTIFICATE OF APPEALABILITY

It is axiomatic that due process and the right to trial by jury "require criminal convictions to rest upon a jury determination that the defendant is guilty of every element of the crime with which he is charged, beyond a reasonable doubt." United States v. Gaudin, 515 U.S. 506, 510 (1995); Patterson v. New York, 432 U.S. 197, 204 (1977). Although state criminal defendants have no federal right to a unanimous jury verdict (at least in noncapital cases), Johnson v. Louisiana, 406 U.S. 356, 359 (1972), the California Constitution requires jury unanimity in a criminal prosecution, Cal. Const. art. I, § 16. At bottom, Petitioner here does not challenge jury unanimity, but instead the California Court of Appeal's interpretation of California conspiracy law. On this point, the Supreme Court has instructed that jurors are not "required to agree upon a single means of commission" of a crime and that federal courts generally may not "substitute [their] own interpretations of state statutes for those of a State's courts." Schad v. Arizona, 501 U.S. 624, 631, 636 (1991) (plurality opinion).

Here, the California Court of Appeal fully detailed why the jury did not need to agree on whom Petitioner conspired to murder. Specifically, the Court of Appeal explained that "the specific crimes that constitute the object of the conspiracy are not elements of the conspiracy." Petitioner cites to the California Supreme Court's holding that "[a] requirement of jury unanimity typically applies to acts that could have been charged as separate offenses." People v. Beardslee, 806 P.2d 1311, 1323 (Cal. 1991). However, the Court of Appeal confronted Beardslee and described why, on the facts of Petitioner's case, the jury was properly instructed. Indeed, the California Court of Appeal has previously recognized that "the [unanimity] instruction as to a single act need not be given where the acts proved are just alternate ways of proving a necessary element of the *same offense*." People v. Mitchell, 232 Cal. Rptr. 438, 441 (Ct. App. 1986) (internal quotation marks and citation omitted). As Petitioner acknowledges in his supplemental points in support of traverse, his argument here overlaps with his argument that the trial court was required to instruct on multiple conspiracies, Supp. Traverse 16, an argument which the Court has addressed above.

Moreover, the California Court of Appeal rejected Petitioner's argument on another legitimate basis, which Petitioner does not challenge here. Specifically, the Court of Appeal concluded that any error was invited by Petitioner. Resp. Ex. 1 at 55. Petitioner could overcome this failure to comply with California's procedural rule only by demonstrating cause and prejudice or a fundamental miscarriage of justice, Coleman v. Thompson, 501 U.S. 722, 750 (1991), neither of which he has tried to show. Accordingly, Petitioner is not entitled to habeas relief on this claim.

### 7. Notice of charges

Petitioner's seventh claim is that the prosecution did not reveal until well after the start of trial that it was relying on "overt acts alleging crimes against Alfonso Urango and James Esparza." Pet. at 23. According to Petitioner, the prosecution's delay deprived him of adequate notice of the charges against him, in violation of the Sixth Amendment and his Fourteenth Amendment right to due process. Pet. at 23.

The California Court of Appeal rejected Petitioner's claim, explaining:

[Petitioner] contends he was deprived of his Sixth and Fourteenth Amendment rights to due process and notice of the allegations that he conspired to murder or assault both Urango and Esparza, where he did not learn of these allegations until four months into trial. We disagree.

At the conclusion of the trial, the prosecution proposed a jury verdict form listing the conspiracy's potential victims. The list included Urango and Esparza, whose names did not appear in the indictment as being involved in the alleged overt acts. [Petitioner] objected to any reference to a conspiracy to murder Urango and Esparza, arguing that [Petitioner] did not have notice of those charges because there was no grand jury testimony given and no overt acts alleged that [Petitioner] had conspired to kill either Urango or Esparza, and that the only evidence connecting [Petitioner] to the Urango and Esparza incidents came up during Salazar's trial testimony. [Petitioner] argues the inclusion of Urango and Esparza in the prosecutor's verdict form violated [Petitioner's] constitutional right to be informed of the nature of the charges against him.

In our discussion on the requirement of jury unanimity, we concluded that the target crimes, that is specific crimes that constitute the object of the conspiracy, are not elements of the conspiracy; rather, they are only the means by which the

purpose of the conspiracy was to be achieved. Because the Urango/Esparza incidents were not an element of the charged conspiracy, the prosecutor's reference added nothing to what the jury needed to reach a finding of conspiracy. The outcome would have been the same.

Consequently, any error was harmless, regardless of whether the standard of review applied is . . . harmless error beyond a reasonable doubt, or . . . reasonable probability of a more favorable outcome.

Resp. Ex. 1 at 57–58.

The Sixth Amendment states that "[i]n all criminal prosecutions, the accused shall enjoy the right . . . to be informed of the nature and cause of the accusation." U.S. Const. amend. VI. Similarly, as a matter of due process, it is "clearly established . . . that notice of the specific charge, and a chance to be heard in a trial of the issues raised by that charge, if desired, are among the constitutional rights of every accused in a criminal proceeding in all courts." Cole v. Arkansas, 333 U.S. 196, 201 (1948); In re Oliver, 333 U.S. 257, 273 (1948) ("A person's right to reasonable notice of a charge against him . . . [is] basic in our system of jurisprudence . . . .").

Here, the California Court of Appeal did not unreasonably apply these broad principles in deciding that Petitioner had adequate notice of the nature and charges against him. In many ways, Petitioner's case mimics Lopez v. Smith, 135 S. Ct. 1 (2014) (per curiam), where the U.S. Supreme Court found habeas relief unwarranted. In that case, the prosecution charged the defendant with murder, a charge which encompassed both principal and aider-and-abettor liability, but focused at trial on the defendant's liability as a principal. Id. at 2. At the close of evidence, the prosecution requested an aiding-and-abetting instruction, which the trial court gave. Id. The Ninth Circuit granted habeas relief, concluding that the defendant's "Sixth Amendment and due process right to notice had been violated because . . . the prosecution (until it requested the aiding-and-abetting jury instruction) had tried the case only on the [principal liability] theory." Id. at 3. The U.S. Supreme Court reversed. The Court reasoned that "the general proposition that a defendant must have adequate notice of the charges against him" was "too abstract to establish clearly the specific rule [the defendant] need[ed]." Id. at 4.

The same is true here. Petitioner does not dispute, nor could he, that he "was on notice that he was charged with conspiracy to commit murder and assault with a deadly weapon by the omnibus conspiracy count of the indictment." Pet. at 22–23. Rather, he contends that he did not receive notice because the indictment and grand jury proceedings did not mention as an overt act anything relating to the attempts to kill Urango and Esparza. Pet. at 23. Petitioner cites no Supreme Court authority requiring such specificity. As the California Court of Appeal noted, the specific crimes that constitute the object of the conspiracy "are not elements of the conspiracy" but "only the means by which the purpose of the conspiracy was to be achieved." Resp. Ex. 1 at 57. In these circumstances, the Court of Appeal could reasonably conclude that failing to include information specific to Urango and Esparza did not undermine Petitioner's notice of the conspiracy charge. Moreover, in at least one respect, this case is less egregious than <u>Lopez</u>: the prosecution here did not simply request an instruction at the close of trial; rather, the prosecution discussed the Urango and Esparza incidents in its opening statement and introduced evidence during its case-in-chief. On those facts, the California Court of Appeal reasonably determined that Petitioner had "notice of the specific charge, and a chance to be heard in a trial of the issues raised by that charge." <u>Cole</u>, 333 U.S. at 201.

In <u>Lopez</u>, the U.S. Supreme Court also distinguished the exact authorities that Petitioner relies on here. First, the Court explained that the decision in <u>Lankford v. Idaho</u>, 500 U.S. 110 (1991), "addressed whether a defendant had adequate notice of the possibility of imposition of the death penalty—a far different question from whether respondent had adequate notice of the particular theory of liability." <u>Lopez</u>, 135 S. Ct. at 4. The Court further differentiated <u>Lankford</u> on the ground that "the trial court itself made specific statements that encouraged the defendant to believe that the death penalty was off the table." <u>Id.</u> Those grounds apply with equal force in the instant case. Second, the Court stated that the Ninth Circuit decision in <u>Sheppard v. Rees</u>, 909 F.2d 1234 (9th Cir. 1989), cannot form the basis for federal habeas relief because circuit precedent may not be used to "refine or sharpen a general principle of Supreme Court jurisprudence into a

specific legal rule that [the] Court has not announced." <u>Lopez</u>, 135 S. Ct. at 4 (quoting <u>Marshall</u>, 569 U.S. at 64). The Ninth Circuit's decision in <u>Sheppard</u> does not directly address the issue presented in this case. <u>See id.</u> Therefore, for essentially the same reasons stated in <u>Lopez</u>, Petitioner is not entitled to habeas relief on this claim.

        8.    <u>Vagueness</u>

        Petitioner's eighth claim is that his conviction for conspiracy to commit murder is unconstitutionally vague and generic. Pet. at 24–25. Specifically, he argues that because "there is no way of saying when he agreed to kill, with whom he agreed, how he agreed, or even whom he agreed to kill," it cannot be discerned whether "the jury relied on any specific illegal conduct." Pet. at 24.

        The California Court of Appeal rejected Petitioner's claim, explaining:

> [Petitioner] contends his conviction for conspiracy to commit murder violates state and federal due process guarantees because a conspiracy to kill one of various persons without agreement upon who was to be killed is unconstitutionally vague and generic. The contention is without merit.

> We have already determined that the trial court was not required to instruct the jury that it had to agree unanimously whom [Petitioner] conspired to kill. Such determination disposes of [Petitioner's] present contention, as well.

> [Petitioner's] reliance on *Suniga v. Bunnell* (9th Cir. 1993) 998 F.2d 664, is misplaced. Due process was implicated in *Suniga* because there was in that case one theory of liability upon which the jury was instructed that did not exist in California law. We do not have such a situation here.

> In any event, any error was harmless because, as discussed, by finding [Petitioner] guilty of the murder of Rosas on the record facts, the jury had also to find unanimously that [Petitioner] had conspired to murder Rosas.

Resp. Ex. 1 at 58.

        As noted above, in at least some circumstances, a state may constitutionally submit multiple theories of criminal liability to a jury without requiring unanimity on any one of them. <u>Schad</u>, 501 U.S. at 631 (plurality opinion). States do not have free rein to define different courses

of conduct as alternative means of committing a single offense, however.  Id. at 632.  Rather, the Due Process Clause mandates that "no person may be punished criminally save upon proof of some specific illegal conduct."  Id. at 633.  For example, a state may not "convict anyone under a charge of 'Crime' so generic that any combination of jury findings of embezzlement, reckless driving, murder, burglary, tax evasion, or littering, for example, would suffice for conviction."  Id.

The California Court of Appeal reasonably concluded that Petitioner's conviction stayed within these constitutional bounds.  Petitioner repeats his argument that "there is no way of saying when he agreed to kill, with whom he agreed, how he agreed, or even whom he agreed to kill."  Pet. at 24.  The Court of Appeal again explained that Petitioner's conviction was based on a specific theory of criminal conduct under the non-generic crime of conspiracy, which does not require the jury to be unanimous on whom Petitioner conspired to kill.  Resp. Ex. 1 at 58.  The instant case is also materially different than Petitioner's cited authority, Suniga v. Bunnell, 998 F.2d 664 (9th Cir. 1993).  In that case, unlike here, due process was implicated because the defendant "could [have] be[en] found guilty of murder on a non-existent legal theory."  Id. at 669.  Thus, even considering Petitioner's Ninth Circuit case, he has not shown entitlement to habeas relief on this claim.

### 9.    Sufficiency of the evidence

Petitioner's ninth claim is that there was insufficient evidence to support his conviction for conspiracy to commit murder.  Pet. at 25–27.  Again emphasizing that the jury was not asked to identify the target of Petitioner's conspiracy, Petitioner argues that his conviction violates due process because "this Court cannot determine whether or not the jury found him guilty of conspiring to kill a person for whom there is constitutionally sufficient evidence in support of the conviction."  Pet. at 25 (capitals omitted).

The California Court of Appeal rejected Petitioner's claim, explaining:

> [Petitioner] contends his conviction for conspiracy to commit murder must be reversed for constitutionally insufficient evidence because this court cannot determine whether or not the jury found him guilty of conspiring to kill a person

for which conspiracy there is constitutionally sufficient evidence in support of conviction. The contention is without merit.

Again, we have already determined that the jury was correctly instructed that it did not need to agree unanimously on which particular murder [Petitioner] conspired to commit so long as it unanimously agreed that [Petitioner] conspired to commit murder as the object of the conspiracy. The jury subsequently found [Petitioner] guilty of the Rosas murder. The guilty finding on the Rosas murder could have only been reached by a unanimous jury finding that [Petitioner] conspired to kill Rosas. That unanimous conspiracy finding was sufficient to support the guilty finding on the single conspiracy count.

Moreover, where the jury is presented with several factual theories for conviction, some of which are predicated upon insufficient evidence, "the appellate court should affirm the judgment unless a review of the entire record affirmatively demonstrates a reasonable probability that the jury in fact found the defendant guilty solely on the unsupported theory." The Rosas murder conviction eliminates such a probability.

Resp. Ex. 1 at 58–59 (citation omitted).

Evidence is constitutionally sufficient to support a conviction when, "viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319 (1979); see also Cavazos v. Smith, 565 U.S. 1, 2 (2011) (per curiam) ("[I]t is the responsibility of the jury—not the court—to decide what conclusions should be drawn from evidence admitted at trial."). The reviewing court presumes that the trier of fact resolved any factual conflicts in the record in favor of the prosecution and defers to that resolution. Jackson, 443 U.S. at 326. The U.S. Supreme Court has "made clear that [sufficiency-of-the-evidence] claims face a high bar in federal habeas proceedings." Coleman v. Johnson, 566 U.S. 650, 651 (2012) (per curiam).

Here, the California Court of Appeal's determination that sufficient evidence supported Petitioner's conspiracy conviction was not objectively unreasonable. The Court of Appeal explained that because there was no record evidence that Petitioner participated in or was present during the Rosas murder, the jury's determination that Petitioner was guilty of the Rosas murder

necessarily demonstrates that sufficient evidence supports that Petitioner conspired to kill Rosas. Resp. Ex. 1 at 59. Indeed, Petitioner does not challenge the sufficiency of the evidence supporting his murder conviction, which included testimony that, in a three-way telephone conversation, Petitioner approved Rosas's murder and gave Chavez the authority to call the hit and testimony that, in prison, Petitioner admitted to ordering the murder. See, e.g., Resp. Ex. 6, RT 12220. Petitioner suggests that because the Court lacks an explicit indication about the jury's theory, the jury's verdict could have rested on an unsupported ground. Pet. at 26. But Petitioner does not identify any affirmative indication that the jury relied on an inadequate ground, and the Court of Appeal followed well settled state and federal law espousing the general rule that "[w]hen a jury returns a guilty verdict on an indictment charging several acts in the conjunctive, . . . the verdict stands if the evidence is sufficient with respect to any one of the acts charged." Griffin v. United States, 502 U.S. 46, 56–57 (1991) (quoting Turner v. United States, 396 U.S. 398, 420 (1970)); see also People v. Guiton, 847 P.2d 45, 52 (Cal. 1993) ("If the inadequacy of proof is purely factual, of a kind the jury is fully equipped to detect, reversal is not required whenever a valid ground for the verdict remains, absent an affirmative indication in the record that the verdict actually did rest on the inadequate ground."). In any event, Petitioner does not develop an argument that the other grounds that could support his conviction (such as conspiracy to kill Urango and Esparza) are unsupported by substantial evidence.

Petitioner raises two additional points. First, he suggests that his conviction could not rest on a conspiracy to murder Rosas because he received a separate punishment for the murder. Pet. at 25–26. That issue goes to sentencing, not to the sufficiency of the evidence supporting his conviction. The Court analyzes that argument below. Second, Petitioner argues that to the extent his conviction was based on gang membership alone, the conviction violates due process. Specifically, he cites the Ninth Circuit's statement in United States v. Garcia, 151 F.3d 1243, 1246 (9th Cir. 1998), that "evidence of gang membership cannot itself prove that an individual has entered a criminal agreement to attack members of rival gangs." First and foremost, Garcia cannot

serve as the basis for habeas relief because it is not a decision of the Supreme Court and does not purport to hold that the U.S. Supreme Court has "clearly established" the stated rule. See Marshall, 569 U.S. at 64. Moreover, the California Court of Appeal did not insinuate that Petitioner's membership in Nuestra Familia alone was enough to show an agreement to accomplish a specific illegal objective; rather, the Court described the defendants' agreement to commit specific crimes to advance "the overriding purpose of the [Nuestra Familia], which was to establish power through the use of crime, force, and fear, and to use that power to further strengthen and perpetuate itself by killing its enemies, raising money for the gang, and instilling obedience and discipline among its members." Resp. Ex. 1 at 45. Accordingly, Petitioner has not shown entitlement to habeas relief on the basis of insufficiency of the evidence.

### 10. Failure to modify withdrawal instruction

Petitioner's tenth claim is that the trial court should have modified California Jury Instructions—Criminal ("CALJIC") No. 6.20, which describes how a member of a conspiracy may effectively withdraw from the conspiracy, before giving it to the jury in this case. Pet. at 27. Specifically, he contends that the instruction could be misread to require oral communication for withdrawal, even though the law clearly allows withdrawal by a non-verbal affirmative act. Pet. at 27. He argues that this instructional error interfered with his Sixth Amendment right to present a defense and to trial by jury and violated his due process rights under the Fourteenth Amendment. Pet. at 28.

The California Court of Appeal rejected Petitioner's claim, explaining:

[Petitioner] contends the trial court violated his state and federal constitutional rights to due process and a fair trial by jury by refusing to give the modified withdrawal instruction that he requested, which was supported by the evidence and which pinpointed the defense theory of the case. The contention is without merit.

[Petitioner] requested the court to give a modified version of CALJIC No. 6.20, reading as follows: "Any member of a conspiracy may withdraw from and cease to be a party to the conspiracy, but [his][her] liability for the acts of [his] [her] co-

Case No.: 03-cv-02930-EJD
ORDER DENYING PETITION FOR WRIT OF HABEAS CORPUS; DENYING CERTIFICATE OF APPEALABILITY

49

conspirators continues until [he][she] effectively withdraws from the conspiracy. [¶] Withdrawal may be communicated by an affirmative act bringing home the fact of [his][her] withdrawal to [his][her] companions. The affirmative act must be made in time for [his][her] companions to effectively abandon the conspiracy and in a way which would be sufficient to inform a reasonable person of the withdrawal. [¶] In order to effectively withdraw from a conspiracy, there must be an affirmative and bona fide rejection or repudiation of the conspiracy which must be communicated to the other conspirators of whom [he][she] has knowledge. [¶] If a member of a conspiracy has effectively withdrawn from the conspiracy [he][she] is not thereafter liable for any act of the co-conspirators committed subsequent to [his][her] withdrawal from the conspiracy, but [he][she] is not relieved of responsibility for the acts of [his][her] co-conspirators committed while [he] [she] was a member. [¶] If the evidence raises a reasonable doubt as to whether the defendant withdrew from the conspiracy, you must find that [he] [she] did withdraw."

The court refused [Petitioner's] request and gave instead the unmodified version of CALJIC No. 6.20, as follows: "A member of a conspiracy is liable for the acts and declarations of his co-conspirators until he effectively withdraws from the conspiracy or the conspiracy has terminated. [¶] In order to effectively withdraw from a conspiracy, there must be an affirmative and good faith rejection or repudiation of the conspiracy which must be communicated to the other conspirators of whom he has knowledge. [¶] If a member of a conspiracy has effectively withdrawn from the conspiracy he is not thereafter liable for any act of the co-conspirators committed after his withdrawal from the conspiracy, but he is not relieved of responsibility for the acts of his co-conspirators committed while he was a member."

[Petitioner] argues that the requested modification should have been granted because without the requested modification "[t]he instruction given could be and probably was interpreted to require that withdrawal from a conspiracy be by oral communication," adding that "[t]his is not correct—one may withdraw from a conspiracy by an 'affirmative act' as well."

The flaw in the argument is that the unmodified version given by the court did not require, and could not be misinterpreted as requiring, that the withdrawal from the conspiracy had to be orally communicated to the coconspirators. As given, the instruction merely required that there be "an affirmative and good faith rejection or repudiation of the conspiracy which must be communicated to the other conspirators of whom he has knowledge." An "affirmative" act need not be oral. We do not see how the language of [Petitioner's] proposed instruction differed from the unmodified version in this regard since both versions used the word "affirmative," and the word "oral" did not appear in either version.

Moreover, [Petitioner's] proposed version created more problems than it attempted to solve. For example, [Petitioner's] version used the word "companions" for "coconspirators." "Companions" is a word without a settled legal definition, and one with loose meaning. "Companions" are not necessarily "coconspirators" within the meaning of California's penal statutes. What exactly did [Petitioner] mean by "companions"? [Petitioner's] proposed version did not define the term.

[Petitioner's] proposed modification also provided that "[t]he affirmative act must be made in time for [his][her] companions to effectively abandon the conspiracy and in a way which would be sufficient to inform a *reasonable person* of the withdrawal." The addition of the "reasonable person" standard to the instruction is highly questionable. [Petitioner] has cited no authority requiring the use of such a standard.

We conclude the trial court did not err in rejecting [Petitioner's] proposed modification to CALJIC No. 6.20, and in giving CALJIC No. 6.20 to the jury without modification.

Resp. Ex. 1 at 59–61 (some alterations in original).

Although instructional errors are cognizable in federal habeas corpus, they "generally may not form the basis for federal habeas relief." Gilmore v. Taylor, 508 U.S. 333, 344 (1993). It is not enough that the instruction was incorrect as a matter of state law. Estelle v. McGuire, 502 U.S. 62, 71–72 (1991). Habeas relief is available if "the ailing instruction by itself so infected the entire trial that the resulting conviction violates due process." Id. at 72 (quoting Cupp v. Naughten, 414 U.S. 141, 147 (1973)). Where the charge as a whole is ambiguous, the question is whether there is a "reasonable likelihood" that the jury misapplied the instruction in a way that violated the defendant's constitutional rights. Estelle, 502 U.S. at 72 (quoting Boyde v. California, 494 U.S. 370, 380 (1990)).

The California Court of Appeal did not unreasonably apply federal law when it concluded that CALJIC No. 6.20 could not be misinterpreted to mean that a defendant can withdraw from a conspiracy only by verbal communication. CALJIC No. 6.20 states: "In order to effectively withdraw from a conspiracy, there must be an affirmative and good faith rejection or repudiation of the conspiracy which must be communicated to the other conspirators of whom he has

United States District Court
Northern District of California

Case No.: 03-cv-02930-EJD
ORDER DENYING PETITION FOR WRIT OF HABEAS CORPUS; DENYING CERTIFICATE OF APPEALABILITY

knowledge." Under the instruction, the defendant must "communicate[]" an "affirmative" rejection or repudiation to the other known conspirators. But nothing in the instruction specifies or suggests that the defendant must orally communicate the withdrawal; the instruction does not use a word like "verbal" or "oral" at all. Instead, the instruction covers non-verbal "affirmative" acts that "communicate[]" the defendant's withdrawal to his coconspirators. With no identified error of state law in the instruction, it was not unreasonable to conclude that a jury could not have been misled.

Petitioner repeats his argument that two Ninth Circuit cases—Escobar de Bright and Unruh—hold that failure to instruct on the defense's theory is an error of constitutional magnitude. Pet. at 28. For the reasons stated above, this circuit precedent cannot give rise to habeas relief in Petitioner's case. Even if Escobar de Bright and Unruh were held to apply here, those cases do not provide defendants with an unfettered right to the instructions of their choice. Rather, the holdings in those cases are tempered by the established rule that "the refusal to give a requested instruction will not be overturned 'if the charge as a whole adequately covers the theory of the defense.'" United States v. Bradshaw, 690 F.2d 704, 710 (9th Cir. 1982) (quoting United States v. Kaplan, 554 F.2d 958, 968 (9th Cir. 1977)). Once Petitioner's argument that CALJIC No. 6.20 is limited to verbal communications of withdrawal is rejected, it is clear that the instruction is broad enough to encompass Petitioner's theory—namely, that he communicated his withdrawal by failing to follow orders to kill Chavez. Pet. at 27. Petitioner's challenge to the withdrawal instruction fails, and he is not entitled to habeas relief on this claim.

11. <u>Consecutive sentences</u>

Petitioner's eleventh claim relates to the trial court's sentencing of Petitioner to twenty-five years to life for the murder of Rosas and a consecutive twenty-five years to life for the conspiracy to commit murder. Pet. at 28. In particular, Petitioner argues that he should not receive consecutive sentences when the "jury never found him guilty of conspiring to murder any specific person other than Rosas." Pet. at 29. According to Petitioner, the trial court decided facts that

increased the penalty of Petitioner's crime beyond the prescribed statutory maximum, in violation of California law and Petitioner's right to trial by jury and due process.  Pet. at 29.

The California Court of Appeal rejected Petitioner's claim, explaining:

> [Petitioner] contends he was improperly sentenced to consecutive terms of 25 years to life for both the Rosas murder conviction and for the conspiracy to commit murder, in violation of section 654.  The contention is without merit.
>
> Section 654, subdivision (a), provides: "An act or omission that is punishable in different ways by different provisions of law shall be punished under the provision that provides for the longest potential term of imprisonment, but in no case shall the act or omission be punished under more than one provision.  An acquittal or conviction and sentence under any one bars a prosecution for the same act or omission under any other."
>
> . . .
>
> With respect to conspiracy, the rule was well summarized . . . as follows: "Because of the prohibition against multiple punishment in section 654, a defendant may not be sentenced 'for conspiracy to commit several crimes and for each of those crimes where the conspiracy had no objective apart from those crimes.  If, however, a conspiracy had an objective apart from an offense for which the defendant is punished, he may properly be sentenced for the conspiracy as well as for that offense.'  Thus, punishment for both conspiracy and the underlying substantive offense has been held impermissible when the conspiracy contemplated only the act performed in the substantive offense, or when the substantive offenses are the means by which the conspiracy is carried out.  Punishment for both conspiracy and substantive offenses has been upheld when the conspiracy has broader or different objectives from the specific substantive offenses."
>
> Here, there is strong evidence that the NF, of which [Petitioner] was a member, conspired to kill not only Rosas, but other persons as well, in addition to the gang's overriding conspiracy discussed [earlier].
>
> We conclude the trial court did not err in not applying section 654, and in sentencing [Petitioner] to consecutive life terms for the Rosas murder and the conspiracy to commit murder.

Resp. Ex. 1 at 66–68 (alterations omitted).

1    The Sixth Amendment's jury-trial guarantee assigns the determination of certain facts to

2    the jury's exclusive province.  Under that guarantee, the U.S. Supreme Court has held that "[o]ther

3    than the fact of a prior conviction, any fact that increases the penalty for a crime beyond the

4    prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable

5    doubt."  Apprendi v. New Jersey, 530 U.S. 466, 490 (2000).  Thus, the crucial issue is whether

6    "the required finding expose[s] the defendant to a greater punishment than that authorized by the

7    jury's guilty verdict."  Id. at 494.

8        Here, the California Court of Appeal's conclusion does not run afoul of Apprendi.  The

9    jury found Petitioner guilty of murder and found Petitioner guilty of conspiracy to commit murder,

10   assault with a deadly weapon, intimidation of witnesses, and possession of a concealed firearm by

11   a convicted felon.  Resp. Ex. 8, CT 1840–43.  In undertaking the task of determining whether to

12   run consecutively the separate twenty-five-years-to-life sentences on each count, the trial court did

13   not make a finding that increased Petitioner's punishment beyond the statutory maximum for

14   either the murder conviction or the conspiracy conviction.  Apprendi itself is distinguishable

15   precisely because it involved sentencing for a discrete crime, not the aggregate effect of multiple

16   crimes.  530 U.S. at 474.  Indeed, Apprendi rooted its rule in the historical tradition of having

17   juries decide factual questions to guard against the tyranny of the state.  Id. at 477.  The California

18   Court of Appeal could reasonably conclude that that same commitment is not implicated in the

19   decision about whether sentences should run concurrently or consecutively.[4]

20        Petitioner separately argues that the Court of Appeal misapplied California Penal Code

21   section 654.  Pet. at 28.  Here, the Court of Appeal fully explained why section 654 was

22   inapplicable: the conspiracy that Petitioner was charged with had a broader objective than the

23   specific substantive offense of murder.  Resp. Ex. 1 at 66–67.  Even if this Court were concerned

24

25

26   [4] Indeed, although it does not constitute governing law for purposes of Petitioner's habeas petition, the Supreme Court later held that Apprendi does not apply to consecutive-sentencing decisions. See Oregon v. Ice, 555 U.S. 160, 168 (2009).

27

that an error was committed, it is not the province of a federal habeas court to correct a

misapplication of state sentencing law absent some identified constitutional issue. See, e.g.,

Richmond v. Lewis, 506 U.S. 40, 50 (1992). Accordingly, Petitioner has not shown entitlement to

habeas relief on this claim.

12.     Shackling

Petitioner's twelfth claim centers on the trial court's decision to have all defendants,

including Petitioner, wear shackles during trial. Pet. at 30–36. Petitioner argues that the shackling

violated his right to an impartial jury and due process because the trial court's decision was not

justified by an essential state interest specific to the trial. Pet. at 35–36. Petitioner further states

that the shackling prejudiced him because the shackles were visible to the jury throughout the trial

and at least some of the jurors saw the shackles. Pet. at 36. Petitioner did not present this claim in

his direct appeal. Rather, he made this claim in a petition for writ of habeas corpus to the

California Supreme Court, and his petition was summarily denied on April 30, 2003. Resp. Ex. 3.

Central to the right to a fair trial, guaranteed by the Sixth and Fourteenth Amendments, is

the notion that "one accused of a crime is entitled to have his guilt or innocence determined solely

on the basis of the evidence introduced at trial, and not on grounds of official suspicion,

indictment, continued custody, or other circumstances not adduced as proof at trial." Taylor v.

Kentucky, 436 U.S. 478, 485 (1978). At the time of the California Supreme Court's decision, the

U.S. Supreme Court defined shackling as "the sort of inherently prejudicial practice that . . .

should be permitted only where justified by an essential state interest specific to each trial."

Holbrook v. Flynn, 475 U.S. 560, 568–69 (1986). Even binding and gagging a defendant could be

constitutionally permissible as a last resort. Illinois v. Allen, 397 U.S. 337, 343–44 (1970). The

determination of an essential state interest "turns on the facts of the case." Hedlund v. Ryan, 854

F.3d 557, 568 (9th Cir. 2017).

On the particular facts of this case, the Court concludes that there was a reasonable basis

for the California Supreme Court to deny relief. The Court recognizes the seriousness of

shackling and the likelihood that the practice could influence a jury in ways that will not be readily apparent in the record. See Riggins v. Nevada, 504 U.S. 127, 137 (1992) (noting that some consequences "cannot be shown from a trial transcript"). Nevertheless, here, the facts and context reasonably demonstrate that the trial court's decision to shackle Petitioner was justified by an essential state interest specific to Petitioner's trial—namely, security of those in the courtroom.

In particular, Petitioner had decision-making authority as a member of a violent gang, which leveraged contacts inside and outside prison to kill those who opposed the gang. Petitioner (as well as the other defendants) was specifically charged with a count of conspiracy to commit witness intimidation. Resp. Ex. 8, CT 1840. And there had been incidents in the lead-up to trial with respect to certain witnesses. For example, after Mari Reyes testified before the grand jury, she was threatened by one of the Nuestra Familia members, being told that she should "be careful or else . . . [she'd] end up like the rest." Resp. Ex. 14, RT 1920–21. Similarly, one of the jailed Nuestra Familia members stated that "when the indictments do come out, we'll start from the top, the ones that done the most damage, we'll eliminate them first, and we'll go down the line." Resp. Ex. 14, RT 3234. On this record, the California Supreme Court could have reasonably concluded that shackling in this case was "justified by an essential state interest specific to [the] trial." Holbrook, 475 U.S. at 569.

Moreover, the trial court held multiple hearings to resolve particular issues related to the shackling.[5] Notably, Petitioner does not identify any place in the record where either he or one of his codefendants requested to be completely free of shackles. However, multiple requests were

---

[5] Although the Court focuses on the shackling-specific hearings, the trial court also held multiple hearings about other security concerns. Among other things, the court dealt with issues relating to defendants' housing, security arrangements during attorney–client meetings, and the number of security personnel in the courtroom. See, e.g., Resp. Ex. 15D, RT 93; Resp. Ex. 15B, RT 263–64; Resp. Ex. 6, RT 5–13. The prosecution highlighted security concerns and reiterated that "there [was] substantial evidence to believe that the lives of witnesses are in danger." Resp. Ex. 15D, RT 79. The court often sought to balance such concerns against the defendants' rights to assistance of counsel. See, e.g., Resp. Ex. 15B, RT 263–64 (ordering that "the writing hand of the defendant be free during the attorney client interview" to facilitate communication between the attorneys and their clients).

made for less restrictive alternatives. Even though the requirement to pursue less restrictive means of shackling was not clearly established until 2005, Crittenden v. Ayers, 624 F.3d 943, 971 (9th Cir. 2010), the trial court specifically considered these alternatives and rejected more restrictive options. For example, at a pretrial hearing in August 1994, defense counsel asked that their clients be allowed to have one hand free during court proceedings. Resp. Ex. 15C, RT 1140. The prosecution objected, noting that the grand jury testimony showed that various defendants would pose a safety risk to witnesses. Resp. Ex. 15C, RT 1141. Defense counsel responded that the safety risk of unshackling one hand was minimal because their "clients would still have leg irons on and one hand restrained." Resp. Ex. 15C, RT 1142. The trial court ruled that "the defense request be honored and that one hand be unshackled." Resp. Ex. 15C, RT 1147. The court explained that such unshackling was necessary to avoid the "possible impediment to the right to present a defense and issues involving human dignity." Resp. Ex. 15C, RT 1147.

At another point in pretrial proceedings, the prosecution raised the issue of whether defendants should wear stun belts in court. When the issue first surfaced, Petitioner's counsel noted at a June 1996 hearing that stun belts would be uncomfortable and "very, very obvious to the jury"; the court deferred ruling until the belts arrived. Resp. Ex. 6, RT 17, 20. At a later hearing, Petitioner's counsel voiced concerns about using the stun belts and stated that "[Petitioner] is opposed to the use of the [stun] belt, much prefers the bolt to the floor as we talked about last Monday." Resp. Ex. 6, RT 253. Finally, when the stun belts arrived, the court held another hearing in July 1996. Resp. Ex. 6, RT 448. At that hearing, Petitioner's counsel stated:

> Since the defendants have been shackled to the bolts on the floor, it's allowed freedom of movement. I can communicate with [Petitioner], it's unobtrusive, can't be seen. It's covered, virtually soundproof and he's comfortable with it.
>
> With regard to the [stun] belt that has been demonstrated, I don't think that would provide the same sort of comfort as far as the defendant is concerned and would be more obtrusive. And the chance of accident with the use of that and injury to other persons other than defendants is certainly present. I object to the use of the electric belt.

Resp. Ex. 6, RT 452. The court concluded that though stun belts could be used, "given the duration of [the] trial, . . . and the willingness of all the defendants to agree to be shackled to the ground . . . , [the court would] exercise [its] discretion and direct that the defendants be shackled to the ground as requested." Resp. Ex. 6, RT 458–59. Based on the trial court's thorough weighing of the factors at play, the California Supreme Court had a reasonable basis to deny habeas relief.

Petitioner's responses do not alter this conclusion. Petitioner first contends that the trial judge was required to hold an evidentiary hearing and make explicit findings of an essential state interest. Pet. at 30. But, as noted above, the trial court convened multiple proceedings at which these issues were discussed in detail. In any event, neither Holbrook nor Allen—the two U.S. Supreme Court shackling cases relevant here—clearly avows that trial courts must hold an evidentiary hearing or recite specific factual findings. It was not until the 2005 decision in Deck v. Missouri, 544 U.S. 622, 634 (2005), that the U.S. Supreme Court clarified that shackling requires a case-by-case determination supported by "formal or informal findings." See also id. at 649 (Thomas, J., dissenting) (criticizing the majority's adoption of an "additional requirement of on-the-record findings" by the trial judge). Even then, the Court left open the possibility that there could be "exceptional case[s] where the record itself makes clear that there are indisputably good reasons for shackling." Id. at 635 (majority opinion). Indeed, before Deck was decided, the Ninth Circuit had stated: "[W]e have never held, and we refuse to hold now, that a trial court must conduct a hearing and make findings before ordering that a defendant be shackled." Morgan v. Bunnell, 24 F.3d 49, 52 (9th Cir. 1994) (per curiam) (quoting Jones v. Meyer, 899 F.2d 883, 886 (9th Cir. 1990)). Thus, even if the Court concluded that the trial court's findings and hearings were imperfect, neither was required by clearly established federal law as of the time of the California Supreme Court decision.

Petitioner also cites to statements by the trial judge that Petitioner believes undermines the notion that security concerns necessitated shackling. First, at one of the hearings involving the stun belts, the trial judge stated, in response to a comment from Lopez's attorney that Lopez had

"never been a problem in court and . . . would prefer the shackle," that "[Lopez has] never been a

problem in the courtroom. None of the defendants have been a problem in the courtroom." Resp.

Ex. 6, RT 13. Then, at the hearing deciding whether to unshackle one of the defendants' hands,

the trial judge stated that "there [had] been no evidence presented to [the court] to suggest that

there would be an escape from th[e] courtroom . . . [or] that any of the defendants might be

violent" and reiterated that "the defendants have never been disruptive and . . . have always been

respectful." Resp. Ex. 15C, RT 1147. Placed in their appropriate context, those statements are not

as broad as they might appear at first blush. For one thing, the judge's statements came in

response to specific requests from the defense lawyers—requests not to use stun belts and requests

to unshackle one hand, respectively. For another, all of those statements were made during

pretrial proceedings, when the risk of danger to witnesses had not yet manifested. Most

importantly, however, the defendants had been shackled during pretrial proceedings, including at

the time that the trial judge made the statements. Thus, it is difficult to interpret the trial judge's

statements as general observations about the defendants' behavior; it is more reasonable to

understand those statements to reflect how the defendants had acted while wearing shackles. In

this way, the trial judge's statements do not detract from the reasonable basis upon which the

California Supreme Court could have denied relief. Accordingly, Petitioner is not entitled to

habeas relief on his shackling claim.

　　　The Court also notes that, on habeas review, Petitioner must show that the error had

"substantial and injurious effect or influence in determining the jury's verdict." Hedlund, 854

F.3d at 568 n.7 (quoting Brecht v. Abrahamson, 507 U.S. 619, 623 (1993)). Petitioner cannot

clear that bar here. In support of his contention that multiple jurors saw his shackles (but did not

see the shackles of the other three defendants), Petition submits only his own notes from trial and

his own drawing of the layout of the courtroom. Pet. Ex. 12. Those materials are not evidence

and, in any event, do not definitively show what the jury could or did see. Petitioner submits no

supporting documentary evidence, such as his own affidavit or an affidavit from one of the jurors.

1   Additionally, prejudice is diminished because Petitioner's counsel did not ask for

2   Petitioner to be unshackled and did not object to the judge informing the jury that Petitioner was

3   shackled. Resp. at 91. As a general matter, "[a] jury is presumed to follow its instructions."

4   Weeks v. Angelone, 528 U.S. 225, 234 (2000). Here, the court told the jury multiple times not to

5   consider the shackling. At the beginning of the case, the court instructed the jury from a statement

6   prepared by one of the defense attorneys: "The defendants in this case are shackled. The fact that

7   they are shackled is not evidence. You cannot allow that to affect your decision in this case, nor

8   can you speculate as to the reason for the shackling." Resp. Ex. 17, RT 651. The court shortly

9   thereafter instructed that the defendants are presumed innocent. Resp. Ex. 17, RT 652. At the end

10  of the case, the court reminded the jury: "The fact that physical restraints have been placed on the

11  defendants must not be considered by you for any purpose. They are not evidence of guilt, and

12  must not be considered by you as any evidence that any defendant is more likely to be guilty than

13  not guilty." Resp. Ex. 11, CT 755. These curative instructions provide assurance that the jury did

14  not rely on Petitioner's shackling, especially where Petitioner's counsel agreed for the jury to be

15  instructed in this manner.

16  Further, and finally, the prosecution had strong evidence tending to show Petitioner's guilt.

17  Both Salazar and Chavez testified that Petitioner had approved the murder of Rosas in the three-

18  way phone call; Petitioner's sister-in-law testified that she heard Petitioner's side of the

19  conversation, which included references to Rosas and the instruction to "do what you got to do";

20  and Shelton testified that Petitioner confessed in prison that he told Salazar and Chavez to deal

21  with Rosas. In light of all of these circumstances, Petitioner has not shown that, even if the trial

22  court erred by ordering shackling, that error had substantial and injurious effect or influence in

23  determining the jury's verdict.

24      13.  Ineffective assistance throughout trial

25  Petitioner's thirteenth claim is that his attorney provided ineffective assistance at multiple

26  stages of the litigation. Pet. at 37–56. Petitioner presented this argument for the first time in a

27  Case No.: 03-cv-02930-EJD
28  ORDER DENYING PETITION FOR WRIT OF HABEAS CORPUS; DENYING CERTIFICATE
    OF APPEALABILITY

habeas petition denied by the California Supreme Court on April 30, 2003. Resp. Ex. 3. Where, as here, an ineffective assistance claim does not accuse an attorney of totally failing to subject the prosecution's case to meaningful adversarial testing, the "specific attorney errors [are] subject to Strickland's performance and prejudice components." Bell v. Cone, 535 U.S. 685, 697–98 (2002). As noted earlier, the performance component asks whether counsel's performance "so undermined the proper functioning of the adversarial process that the [proceedings] cannot be relied on as having produced a just result." Strickland, 466 U.S. at 686. As the U.S. Supreme Court has instructed, courts must "apply[] a heavy measure of deference to counsel's judgments." Id. at 691. The prejudice component asks whether "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." Id. at 694.

Petitioner's contentions fall into three groups. First, Petitioner challenges his attorney's decision to oppose the severance motion brought by other defendants. Second, Petitioner disagrees with his attorney's handling of certain evidence related to the murder of Rosas. Third, Petitioner argues that his attorney did not adequately pursue evidentiary avenues in opposing the prosecution's motion to vacate Petitioner's plea agreement. The Court analyzes each of these categories in turn.

a.    Motion to sever

Petitioner first claims that his attorney's performance with respect to the prosecution's motion to consolidate was deficient. Pet. at 38–46. The Court begins with a brief factual background. The prosecution moved to consolidate two indictments charging twenty-one defendants in total. In one of the indictments, Petitioner was charged with conspiracy to commit various crimes (including murder) in Count One and murder of Rosas in Count Twelve. Resp. Ex. 8, CT 1370–72, 1388–89. Eighteen other defendants were also charged in Count One, and six other defendants were also charged in Count Twelve. Resp. Ex. 8, CT 1370, 1388–89.

Multiple defendants opposed consolidation and filed differing motions to sever. For example, Truejque moved to sever his trial from that of Hernandez and Reveles, Petitioner, and

Count Twelve. Pet. Ex. 2 at 9. Arroyo and Serna moved to sever Hernandez and Reveles, and Arroyo also moved to sever Petitioner. Pet. Ex. 3 at 4–5; Pet. Ex. 4 at 12. The prosecution objected to the severance of Petitioner. Important here, Petitioner's counsel filed a motion opposing the severance of Petitioner. Resp. Ex. 8, CT 1104–07. The motion explained that "if [Petitioner] was charged in the indictment with Count 12 only, as are [Hernandez] and [Reveles], justice would best be served and the court discretion would best be exercised by granting the severance." Resp. Ex. 8, CT 1104. However, because Petitioner was also charged in Count One (along with Truejque, Arroyo, and Serna), the motion argued that Petitioner should not be severed. Resp. Ex. 8, CT 1105–07. The court severed the trial of Hernandez and Reveles but otherwise granted the prosecution's motion to consolidate the indictments. Resp. Ex. 8, CT 1110.

Petitioner asserts that opposing severance and supporting consolidation constituted constitutionally deficient performance on the part of his attorney. Although Petitioner identifies good reasons to think that severance may have been warranted, Petitioner's counsel's motion opposing severance also identifies good reasons to support consolidation. On these facts, there is a reasonable basis to conclude that Petitioner's counsel, in conjunction with his client, made an informed tactical decision that did not wholly undermine the proper functioning of the adversarial process.

As Petitioner's counsel's motion opposing severance explains, Petitioner's case was unlike Hernandez's and Reveles's. Those defendants were charged only in Count Twelve, and none of the remaining defendants were charged in that count. Resp. Ex. 8, CT 1104. Although Petitioner was also charged in Count Twelve, he shared an overlapping charge with the remaining defendants—namely, the conspiracy to commit murder and other crimes in Count One. Resp. Ex. 8, CT 1105. Therefore, trying Petitioner together with the other defendants would produce efficiencies well-recognized and favored under federal and state law. See Zafiro v. United States, 506 U.S. 534, 537 (1993) ("There is a preference in the federal system for joint trials of defendants

United States District Court
Northern District of California

1  who are indicted together."); People v. Ochoa, 966 P.2d 442, 475 (Cal. 1998) ("Because

2  consolidation ordinarily promotes efficiency, the law prefers it.").

3       Likewise, Petitioner's counsel could reasonably have believed that trying Petitioner with

4  the remaining defendants would be beneficial. Although the other defendants were charged with

5  capital crimes, Petitioner's counsel could have reasonably believed that any prejudice would be

6  overcome by Petitioner seeming less culpable by comparison. Resp. Ex. 6, RT 17627 ("I felt from

7  a tactical standpoint it would be better for [Petitioner] to be tried with the death penalty defendants

8  since he is the least culpable of all, he would be viewed in a better light by the jury . . . ."); see also

9  People v. Balderas, 711 P.2d 480, 492 (Cal. 1985) ("[N]othing in the prior cases suggests that

10  severance is required whenever capital charges are involved."). Petitioner's counsel also

11  highlighted the downfalls of severance: Petitioner could suffer prejudice from being tried with

12  Hernandez and Reveles, who were charged with fewer crimes that had more tangential ties to the

13  gang, and Petitioner could be subjected to multiple full trials on the murder and conspiracy counts,

14  resulting in a possible violation of Petitioner's due process rights. Resp. Ex. 8, CT 1105–06;

15  Resp. Ex. 18, RT 7. In light of these alternatives, Petitioner's counsel could reasonably conclude

16  that consolidation was the preferable course.

17       The record also suggests that the decision about whether to oppose severance was fully

18  deliberated between Petitioner and his counsel. As a general matter, Petitioner's counsel testified

19  at a hearing that he had "fully informed [Petitioner] and [had] discussed all of the important

20  decisions with regard to this case." Resp. Ex. 6, RT 17626. More specifically, with regard to the

21  motions for severance, Petitioner's counsel stated that he had considered the positives and

22  negatives to each of the various options. Resp. Ex. 6, RT 17627. As Petitioner's counsel

23  described, opposing severance "was a tactical decision that was made and made with [Petitioner's]

24  knowledge." Resp. Ex. 6, RT 17627; see also Resp. Ex. 6, RT 17627–28 ("With regard to . . .

25  refus[ing] to file motion for severance, I indicated . . . that we opposed that, we opposed the

26  motion for severance."). Indeed, in a filing submitted to the court, Petitioner admitted that he had

27

1   "agreed not to be severed from th[e] case because [he] was convinced that every defendant made

2   [him] look innocent according to [his attorney]." Resp. Ex. 8, CT 1710. Thus, the record supports

3   that Petitioner and his attorney made an informed decision together about whether to oppose

4   severance. The California Supreme Court could have reasonably determined that Petitioner had

5   failed to establish the performance component of his ineffective assistance claim on the severance

6   issue.

7           Finally, even if Petitioner had shown deficiency in performance, the California Supreme

8   Court could have reasonably concluded that he had not made the requisite showing of prejudice.

9   Improper joinder does not automatically result in a constitutional violation. United States v. Lane,

10  474 U.S. 438, 446 n.8 (1986). And there is reason to think that the trial court would not have

11  granted severance even if Petitioner's attorney had not opposed or had affirmatively asked for it.

12  As noted above, California law (as well as federal law) has stated a preference for joint trials. See

13  Ochoa, 966 P.2d at 475; see also Zafiro, 506 U.S. at 537. "The burden is on the party seeking

14  severance to clearly establish that there is a substantial danger of prejudice requiring that the

15  charges be separately tried." People v. Bean, 760 P.2d 996, 1007 (Cal. 1988). Here, the

16  prosecution made the same arguments as Petitioner's counsel in its oppositions to the various

17  defendants' severance motions. See Resp. at 97. Given that California law starts with a

18  presumption of trying defendants together when they are jointly charged in at least one count, see

19  Cal. Penal Code § 1098; People v. Ortiz, 583 P.2d 113, 116–17 (Cal. 1978), it makes sense that

20  the trial court would sever Hernandez and Reveles (who were charged only in Count Twelve) but

21  not Petitioner (who was charged in Counts One and Twelve). In these circumstances, the

22  California Supreme Court could reasonably conclude that Petitioner had not shown "a reasonable

23  probability that, but for counsel's unprofessional errors, the result of the proceeding would have

24  been different." Strickland, 566 U.S. at 694. Accordingly, Petitioner is not entitled to habeas

25  relief on the ground that his attorney provided ineffective assistance of counsel as to the motion to

26  sever.

27  Case No.: 03-cv-02930-EJD

28  ORDER DENYING PETITION FOR WRIT OF HABEAS CORPUS; DENYING CERTIFICATE
    OF APPEALABILITY

b.  Rosas murder evidence

Petitioner next contends that he received ineffective assistance because his counsel improperly handled certain evidence related to the Rosas murder. Pet. at 46–49. Specifically, Petitioner argues that his counsel should have elicited particular testimony from three witnesses. Pet. at 46–49. Petitioner cites no U.S. Supreme Court authority requiring counsel to present the particular evidence at issue here. Accordingly, the Court analyzes counsel's conduct with respect to each witness under Strickland.

First, Petitioner asserts that his counsel failed to ask certain questions of Mary Rosas, the cousin of target Elias Rosas. Petitioner submits an investigative report by the Santa Clara Office of the District Attorney in which Mary Rosas states that Raul Reveles sent a message to Elias that he planned to kill Elias because he blamed Elias for a narcotics arrest. Pet. Ex. 9 at 2. Petitioner does not submit a sworn declaration from Mary Rosas or other evidence to confirm that Mary Rosas would have testified under oath to the same effect. Moreover, Petitioner's counsel would not have been able to question Mary Rosas about her statement in court: her statement almost certainly constitutes inadmissible hearsay because it merely reflects second-hand knowledge of what others said. See generally People v. Sanchez, 374 P.3d 320, 326 (Cal. 2016). Thus, Petitioner cannot claim that his counsel acted unreasonably in "fail[ing] to question Mary Rosas regarding Raul Reveles['s] 1990 threats." Pet. at 46.

Second, Petitioner condemns his counsel's failure to question Roland Saldivar about his statement during a police interview. In particular, Petitioner reads Saldivar's statement to assert that "Salazar did not telephone [P]etitioner for any reason the night Elias Rosas was killed as alleged by the prosecution." Pet. at 48. The problem is that Petitioner had admitted to the prosecution, in an interview where Petitioner's attorney was present, that he had received two phone calls from Salazar that night. Resp. Ex. 21, RT 14. Thus, the two stories appeared to be in conflict, and Petitioner's counsel could have reasonably believed that presenting Saldivar's narrative could undermine Petitioner's. Moreover, other facts weakened the import of Saldivar's

United States District Court
Northern District of California

Case No.: 03-cv-02930-EJD
ORDER DENYING PETITION FOR WRIT OF HABEAS CORPUS; DENYING CERTIFICATE OF APPEALABILITY

statement.  Although Saldivar stated that he was present with Salazar when Salazar was talking with Chavez on the phone about Rosas and the decision was made to murder Rosas, his statement does not preclude a three-way conversation with Petitioner, especially when Saldivar acknowledged that he was not allowed to hear much. Pet. Ex. 13.  Out of the presence of the jury, Saldivar further testified that he could not remember what Salazar said in the phone call.  Resp. Ex. 6, RT 16986.  Given the low value of eliciting Saldivar's testimony on this point, combined with Petitioner's counsel's knowledge that Petitioner had stated under oath that he had talked to Salazar on the night of the Rosas murder, Petitioner's counsel could have reasonably concluded that it was best not to press Saldivar and risk harmful testimony.

Third, Petitioner claims that his counsel was ineffective in failing to call Reveles, who allegedly made a statement that Petitioner was innocent of the murder of Rosas.  Petitioner's counsel addressed this point at a hearing before the trial court.  He explained that "[a]ll Albert Reveles said was that as far as he knew, [Petitioner] had nothing to do with the communications between . . . Chavez and Salazar."  Resp. Ex. 6, RT 17737.  But, as Petitioner's counsel described, that fact did not necessarily prove anything because Reveles was not in a position to know whether Petitioner was involved or not.  Resp. Ex. 6, RT 17737.  Thus, in Petitioner's counsel's view, "[Reveles] was no help to . . . [Petitioner] as far as [he] could see."  Resp. Ex. 6, RT 17737.  Petitioner's counsel also indicated that he had discussed the matter with Petitioner.  Resp. Ex. 6, RT 17737.   Because Petitioner does not specify the basis for his assertion about Reveles or otherwise submit an affidavit from Reveles, it was reasonable to conclude that Petitioner had not shown that his attorney's performance was constitutionally deficient.  See Strickland, 466 U.S. at 686.

Accordingly, there was a reasonable basis for the California Supreme Court to deny Petitioner's claim that his attorney improperly handled the identified evidence related to the Rosas murder.

c. Motion to vacate Petitioner's plea agreement

Finally, Petitioner adds further arguments to those made above about why his attorney provided ineffective assistance with regard to the proceedings on the prosecution's motion to vacate Petitioner's plea agreement. Pet. at 49–53. Specifically, Petitioner challenges his counsel's (1) refusal to secure a copy of the polygraph readout and (2) decision not to call two witnesses to testify that Petitioner wished to correct errors in a March 1993 statement to the prosecution. Pet. at 49–53. The Court analyzes these specific challenges in turn.

Based on the record, the California Supreme Court could have reasonably concluded that the decision not to obtain the polygraph readout was reasonable. It is true that "counsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary." Strickland, 466 U.S. at 691. Nevertheless, counsel's conduct is measured "from counsel's perspective at the time." Id. at 689. Although Petitioner cites a 1998 declaration from the polygraph operator that he believed that he had contacted Petitioner's counsel and recommended performing a second polygraph examination, Pet. Ex. 10 at 3, it is not clear that that information was before his counsel at the time of the motion to vacate. In fact, Petitioner's counsel stated in an affidavit that the polygraph operator "did not at any time indicate," in his report or otherwise, "that a second examination of [Petitioner] was necessary or called for in order to render an accurate result." Resp. Ex. 23. Indeed, Petitioner's counsel declared that, if he had received such a suggestion, he would have actively pursued a second polygraph to avoid going to trial. Resp. Ex. 21, RT 71–72; Resp. Ex. 23. On this basis, it would have been reasonable for the California Supreme Court to conclude that Petitioner had not shown that his counsel's actions were outside the range of professional competent assistance.

The record also supports a reasonable conclusion that Petitioner's counsel made a sound judgment not to call two persons associated with the prosecution as witnesses during the proceedings on the motion to vacate. Petitioner claims that his attorney should have put on prosecution investigator Williams and Sergeant Quimet to testify that Petitioner had contacted

United States District Court
Northern District of California

them to correct errors in his statement to the prosecution in March 1993. Pet. at 52–53. However, Petitioner suggests that he wished to give further background facts and clarify discrepancies, not that he wished to recant or fully revise his statement. Pet. at 52–53. Indeed, Petitioner does not provide a declaration from Williams or Quimet that details what Petitioner said to them. In these circumstances, Petitioner's counsel's explanation is eminently reasonable: "I didn't call them because I didn't feel what they could contribute was relevant to whether or not there was a conflict, whether or not there was an effort to deceive the prosecution during the course of the giving of those statements." Resp. Ex. 6, RT 17742. Accordingly, there was a reasonable basis for the California Supreme Court to deny Petitioner's claim that his attorney's conduct in the proceedings on the prosecution's motion to vacate Petitioner's plea agreement fell below an objective standard of reasonableness.

In sum, Petitioner has not shown entitlement to habeas relief on his claim for ineffective assistance of counsel.

### 14. Right to control defense

Petitioner's fourteenth, and last, claim relates to decisions made by his counsel about what evidence to present in defense at trial. Pet. at 57–72. Specifically, Petitioner states that he wished to present evidence, in the form of his testimony and testimony from other witnesses, that he never received the three-way phone call where he allegedly ordered the hit on Rosas. Pet. at 70. Petitioner contends that his Sixth Amendment right to present a defense was infringed. Pet. at 71. Like with the previous two claims, Petitioner did not present this claim in his direct appeal, but instead in a petition for writ of habeas corpus, which was summarily denied by the California Supreme Court on April 30, 2003. Resp. Ex. 3.

Petitioner cites only one U.S. Supreme Court case in support of his arguments, Faretta v. California, 422 U.S. 806 (1975). That case is inapplicable here. There, the U.S. Supreme Court held that "[t]he Sixth Amendment, when naturally read, . . . implies a right of self-representation." Id. at 821. Thus, in the circumstance where a defendant "clearly and unequivocally declared to the

trial judge that he wanted to represent himself and did not want counsel," the court "deprived him of his constitutional right to conduct his own defense" by forcing him "to accept against his will a state-appointed public defender." Id. at 835–36. Here, Petitioner does not contend that he wished to represent himself. Instead, he asserts the right to control what witnesses to call, what questions to ask those witnesses, and what defense to assert. Nothing in Faretta clearly establishes that level of control when a defendant is represented. To the contrary, Faretta indicates that "when a defendant chooses to have a lawyer manage and present his case, law and tradition may allocate to the counsel the power to make binding decisions of trial strategy in many areas." Id. at 820. Petitioner does not argue by reference to other U.S. Supreme Court authority that his lawyer was not entitled to make the particular decisions at issue in this case. As the trial court put it, "[i]t's the attorney's job in a case to make tactical decisions and to conduct a defense in a way that the lawyer feels will be beneficial to the client." Resp. Ex. 6, RT 20105.

Certainly, Petitioner's counsel could not make the decision about whether Petitioner should testify. A criminal defendant has the right to testify on his own behalf and retains the right to make the decision whether to testify. Rock v. Arkansas, 483 U.S. 44, 52–53 (1987); Jones v. Barnes, 463 U.S. 745, 751 (1983) (noting that "the accused has the ultimate authority to make certain fundamental decisions regarding the case," including whether to "testify in his or her own behalf"). But the facts definitively show that Petitioner was informed about his right to testify. On July 11, 1997, the trial court held a hearing at the same time that the jury was deliberating to explore Petitioner's grounds for dismissing his attorney. Resp. Ex. 6, RT 20084. At the hearing, Petitioner stated: "I know I have the right to take the stand on my behalf and I know that I have a right not to take the stand." Resp. Ex. 6, RT 20092. His sole objection was that "[he] would have been better off taking the stand like [he] wanted to." Resp. Ex. 6, RT 20092; see also Resp. Ex. 6, RT 20092 ("I think I would have been better to take the stand to defend myself on my behalf."). Petitioner's counsel responded that "[w]e've discussed his testifying from the moment I first interviewed him in the county jail, his right to testify and what the problems were, what the pitfalls

were from his testifying." Resp. Ex. 6, RT 20098. At the end of the hearing, the court denied

Petitioner's request and stated that "I do not believe that [your attorney] did not adequately explain

to you about the right to testify or not to testify. I am satisfied that you knew exactly what right

you had with reference to that." Resp. Ex. 6, RT 20104. Petitioner did not otherwise assert that

his attorney prevented him from testifying. Accordingly, Petitioner is not entitled to habeas relief

on this claim.

## CONCLUSION

After a careful review of the record and pertinent law, the Court concludes that the Petition

for a Writ of Habeas Corpus is **DENIED**.

Further, a Certificate of Appealability is **DENIED**. See Rule 11(a) of the Rules Governing

Section 2254 Cases. Petitioner has not made "a substantial showing of the denial of a

constitutional right." 28 U.S.C. § 2253(c)(2). Nor has Petitioner demonstrated that "reasonable

jurists would find the district court's assessment of the constitutional claims debatable or wrong."

Slack v. McDaniel, 529 U.S. 473, 484 (2000). Petitioner may not appeal the denial of a Certificate

of Appealability but may seek a certificate from the Court of Appeals under Rule 22 of the Federal

Rules of Appellate Procedure. See Rule 11(a) of the Rules Governing Section 2254 Cases.

The clerk shall terminate any pending motions, enter judgment in favor of Respondent, and

close the file.

SO ORDERED.

Dated: March 27, 2018

EDWARD J. DAVILA
United States District Judge

Case No.: 03-cv-02930-EJD
ORDER DENYING PETITION FOR WRIT OF HABEAS CORPUS; DENYING CERTIFICATE
OF APPEALABILITY

United States District Court
Northern District of California